# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————————

No. 19-56510

———————————————

In re: ANY AND ALL FUNDS HELD IN REPUBLIC BANK OF ARIZONA
ACCOUNTS XXXX1889, XXXX2592, XXXX1938, XXXX2912, AND
XXXX2500,

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JAMES LARKIN, Real Party in Interest Defendant; JOHN BRUNST, Real Party
in Interest Defendant; MICHAEL LACEY, Real Party in Interest Defendant;
SCOTT SPEAR; Real Party in Interest Defendant,
*Movants-Appellants*.

———————————————

On Appeal from United States District Court for the Central District of California
The Honorable R. Gary Klausner, United States District Judge

———————————————

## OPENING BRIEF OF APPELLANTS JAMES LARKIN,
## JOHN BRUNST, MICHAEL LACEY AND SCOTT SPEAR

———————————————

James C. Grant
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 622-3150
Facsimile: (206) 757-7700
Email: jamesgrant@dwt.com

Robert Corn-Revere
Ronald G. London
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800
Washington, DC 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
ronaldlondon@dwt.com

*Additional Counsel Listed on Next Page*

*List of Additional Counsel*

Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN PC
903 Calle Amanecer
Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
Email: tbienert@bienertkatzman.com
      wbernstein@bienertkatzman.com

Paul John Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME
  CAMBRIA LLP
42 Delaware Avenue
Suite 300
Buffalo, NY 14202-3857
Telephone: (716) 849-1333
Email: pcambria@lglaw.com
     eparis@lglaw.com

Bruce Feder
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road
Suite 160
Phoenix, AZ 85016
Direct: (602) 257-0135
Email: bf@federlawpa.com

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER,
  WOLPERT, NESSIM, DROOKS,
  LINCENBERG & RHOW P.C.
Suite 2300
1875 Century Park East
Los Angeles, CA 90067-2561
Telephone: (310) 201-2100
Email: glincenberg@birdmarella.com
    aneuman@birdmarella.com
    gpanchapakesan@birdmarella.com

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION.......................................................... 3

STATUTORY PROVISIONS ..................................................................... 4

STATEMENT OF THE ISSUE ................................................................. 4

STATEMENT OF THE CASE................................................................... 4

    A.    History of Backpage.com. ........................................................ 4

    B.    Backpage.com's Litigation History. ..................................... 6

    C.    Criminal Prosecution in Arizona.......................................... 8

    D.    *Ex Parte* Civil Seizures and Forfeiture Actions in California. ........... 10

    E.    Motion to Vacate or Modify the Seizure Warrants and Prior Rulings.................................................................... 12

    F.    The Decision on Remand. ...................................................... 13

STANDARD OF REVIEW ....................................................................... 14

SUMMARY OF THE ARGUMENT ........................................................ 15

ARGUMENT ............................................................................................ 17

I.    The District Court's Refusal to Vacate the Seizures Constitutes an Unprecedented Intrusion into First Amendment Protections for Publishers............................................................................................. 17

    A.    The Order Violates Bedrock Principles of First Amendment Law. ..................................................................... 17

        1.    The Government Must Prove Speech is Unprotected.............. 18

        2.    First Amendment Harm Includes More Than Just Prior Restraints................................................................. 23

i

B.      The District Court's Holding Would Empower the Government to Discipline Publishers or Speakers Whenever it Alleges Speech is Unprotected. .........................................................................29

C.      The District Court Misanalyzed First Amendment Cases That Have Invalidated Seizures. ...............................................................34

        1.      Pre-Conviction Seizures and Asset Freezes Have Been Invalidated in Every Case. ......................................................34

        2.      The District Court Failed to Distinguish This Case .................38

D.      The District Court's Order Improperly Reverses the Burden of Proof. ....................................................................................................42

CONCLUSION ...........................................................................................................43

ADDENDUM OF CONSTITUTIONAL AND STATUTORY PROVISIONS

STATEMENT OF RELATED CASES

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adult Video Ass'n v. Barr*,
  960 F.2d 781 (9th Cir. 1992) ................................................................35, 36, 38

*Adult Video Ass'n v. Reno*,
  41 F.3d 503 (9th Cir. 1994) ................................................................35, 36, 38

*American Library Ass'n v. Thornburgh*,
  713 F. Supp. 469 (D.D.C. 1989), *rev'd on standing grounds sub
  nom. American Library Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir.
  1992) ................................................................................................36, 39

*Any & All Funds Held in Republic Bank of Ariz. Accounts*,
  774 F. App'x 400 (9th Cir. 2019) ...............................................................3, 13

*Ashcroft v. ACLU*,
  535 U.S. 564 (2002) ...........................................................................19

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ...................................................................20, 21, 33

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d 805 (M.D. Tenn. 2013) ......................................................7, 20

*Backpage.com, LLC v. Dart*,
  807 F.3d 229, 231 (7th Cir. 2015),
  *cert. denied*, 137 S. Ct. 46 (2016).....................................................7, 8, 20, 40

*Backpage.com, LLC v. Dart*,
  No. 1:15-cv-06340 (N.D. Ill. July 21, 2015) ......................................................9

*Backpage.com, LLC v. Hoffman*,
  2013 WL 4502097 (D.N.J. Aug. 26, 2013) ....................................................7, 20

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ..........................................5, 7, 20, 21

*Backpage.com, LLC v. McKenna*,
No. 2:12-cv-00954 (W.D. Wash. June 4, 2012) ...................................................9

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ...........................................................................................40

*Bartniki v. Vopper*,
532 U.S. 514 (2001) ..........................................................................................21

*Berger v. City of Seattle*,
569 F.3d 1029 (9th Cir. 2009) .........................................................................15

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ..........................................................................................19

*Bridges v. California*,
314 U.S. 252 (1941) ...............................................................................26, 28, 39

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) ..........................................................................................21

*Camfield v. City of Oklahoma City*,
248 F.3d 1214 (10th Cir. 2001) .......................................................................33

*Center for Democracy & Tech. v. Pappert*,
337 F. Supp. 2d 606 (E.D. Pa. 2004) ................................................................19

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942) ..........................................................................................21

*Citizens United v. FEC*,
558 U.S. 310 (2010) ..........................................................................................25

*Cohen v. Beneficial Industrial Loan Corp.*,
337 U.S. 541 (1949) ............................................................................................4

*Curran v. Price*,
638 A.2d 93 (Md. 1994) ....................................................................................37

*Dart v. Craigslist, Inc.*,
665 F. Supp. 2d 961 (N.D. Ill. 2009) ..............................................................6, 20

*Davis v. Walker*,
745 F.3d 1303 (9th Cir. 2014) ............................................................3

*Doe v. Backpage.com, LLC*,
104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd*, 817 F.3d 12
(1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017) ......................7, 20

*Fogel v. Collins*,
531 F.3d 824 (9th Cir. 2008) ...........................................................23

*Fort Wayne Books v. Indiana*,
489 U.S. 46 (1989)...............................................................34, 35, 36

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949)...................................................................19, 21

*Grosjean v. American Press Co.*,
297 U.S. 233 (1936)...................................................................27, 28

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)........................................................................15

*In re Opinion of Justices to the Senate*,
764 N.E.2d 343 (Mass. 2002) ..........................................................37

*Jefferson v. United States*,
340 F.2d 193 (9th Cir. 1965) ...........................................................22

*Keenan v. Superior Ct.*,
40 P.3d 718 (Cal. 2002) ..................................................................37

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*,
809 F. Supp. 2d 1041 (E.D. Mo. 2011) ........................................7, 20

*Marcus v. Search Warrants of Prop. at 104 E. Tenth St.*,
367 U.S. 717 (1961)........................................................................19

*Matal v. Tam*,
137 S. Ct. 1744 (2017).....................................................................27

*Miller v. California*,
413 U.S. 15 (1973)..........................................................................19

*Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*,
    460 U.S. 575 (1983).......................................................................27, 28

*NAACP v. Alabama*,
    357 U.S. 449 (1958)..................................................................27, 28, 39

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)..................................................................22, 30, 31

*Near v. Minnesota*,
    283 U.S. 697 (1931)..................................................................24, 25, 41

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)......................................................................19

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971)......................................................................29

*Oklahoma ex rel. Macy v. Blockbuster Videos, Inc.*,
    1998 WL 1108158 (W.D. Okla. Oct. 20, 1998) ................................33

*Omidi v. United States*,
    851 F.3d 859 (9th Cir. 2017) ...........................................................43

*People v. Ferrer*,
    2016 WL 7237305 (Cal. Super. Ct. Dec. 16, 2016) ...........................7

*People v. Ferrer*,
    No. 16FE024013, slip op. (Cal. Super. Ct. Aug. 23, 2017)............7, 20

*PHE, Inc. v. DOJ*,
    1993 WL 455944 (D.D.C. Oct. 26, 1993) ........................................32

*PHE, Inc. v. DOJ*,
    743 F. Supp. 15 (D.D.C. 1990)........................................................32

*Seres v. Lerner*,
    102 P.3d 91 (Nev. 2004)..................................................................37

*Simon & Schuster, Inc. v. Members of New York State Crime
Victims Board*,
    502 U.S. 105 (1991)..................................................36, 37, 41, 42

*Stanford v. Texas,*
379 U.S. 476 (1965)........................................................................19

*State ex rel. Napolitano v. Gravano,*
60 P.3d 246 (Ariz. App. Ct. 2002)....................................37

*Timbs v. Indiana,*
139 S. Ct. 682 (2019)........................................................27

*United States v. Bagdasarian,*
652 F.3d 1113 (9th Cir. 2011) ....................................23

*United States v. Cassel,*
408 F.3d 622 (9th Cir. 2005) ......................................23

*United States v. Dellinger,*
472 F.2d 340 (7th Cir. 1972) .....................................22

*United States v. Freeman,*
761 F.2d 549 (9th Cir. 1985) .....................................21

*United States v. Gilbert,*
813 F.2d 1523 (9th Cir. 1987) ...................................22

*United States v. Harrell,*
530 F.3d 1051 (9th Cir. 2008) ...................................43

*United States v. Liquidators of European Fed. Credit Bank,*
630 F.3d 1139 (9th Cir. 2011) ..................................15

*United States v. National Treasury Emps. Union,*
513 U.S. 454 (1995)........................................................27

*United States v. Playboy Entm't Grp., Inc.,*
529 U.S. 803 (2000)..........................................18, 27, 28

*United States v. Sineneng-Smith,*
910 F.3d 461 (9th Cir. 2018),
*cert. granted,* 140 S. Ct. 36 (Oct. 4, 2019) .............18, 19, 21

*United States v. Spock,*
416 F.2d 165 (1st Cir. 1969)..........................................22

*United States v. Stevens*,
   559 U.S. 460 (2010).....................................................................................18, 19

*United States v. Stone*,
   2012 WL 1034937 (E.D. Mich. Mar. 27, 2012)...............................................22

*United States v. Vallone*,
   698 F.3d 416 (7th Cir. 2012) ...........................................................................22

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994)............................................................................................33

*Virginia v. Black*,
   538 U.S. 343 (2003).....................................................................................22, 23

**Constitutional Provisions**

U.S. Const. amend. I .......................................................................................*passim*

U.S. Const. amend. IV ..............................................................................1, 12, 14

U.S. Const. amend. V...........................................................................................12

U.S. Const. amend. VI ..................................................................................12, 14

U.S. Const. amend. XIV .....................................................................................28

**Statutes**

18 U.S.C.
    § 371.................................................................................8
    § 794(d)...........................................................................30
    § 981(a)(1)(C)..................................................................34
    § 981(a)(1)(G)(i)..............................................................32
    § 1467(c)..........................................................................33
    § 1952...............................................................................8
    § 1956...............................................................................8
    § 1957...............................................................................8
    § 1963(d)...................................................................36, 37
    § 2252.............................................................................33
    § 2252A..........................................................................33
    § 2253.............................................................................34
    § 2254.............................................................................34
    § 2255...............................................................................7
    § 2260.............................................................................33
    § 2332b(a)(1)(B)..............................................................32
    § 2332b(a)(2)...................................................................32

28 U.S.C.
    § 1291...............................................................................3
    § 1292(a)(1) .....................................................................3

**Rules**

Circuit Rule 28-2.7.................................................................4

Fed. R. Crim. P. 41(g)......................................................14, 43

**Other Authorities**

ENCYCLOPEDIA BRITANNICA
    (https://www.britannica.com/topic/Pentagon-Papers)........................30

George C. Covington, *Constitutional Law–The First Amendment and
    Protest Boycotts: NAACP v. Claiborne Hardware Co.*, 62 N.C. L.
    REV. 399 (1984)...............................................................31

**INTRODUCTION**

This case involves the government's abuse of civil forfeiture authority to support a criminal prosecution in disregard of well-established constitutional rights. At issue is the government's seizure of essentially all of Appellants' assets on the theory that they were derived from or connected to a website the government claims facilitated the unlawful conduct of third parties who posted ads on the site. The government asserts it can do this based on nothing more than its allegations that publication of the website was illegal and *ex parte* findings of probable cause by magistrates presented with the government's warrant applications. The district court approved this approach.

The government's tack and the district court's decision contravene long-established First and Fourth Amendments principles. The government may not restrain or punish publication of speech absent *proof* of illegality—mere allegations or probable cause are not enough. The government may never presume its conclusion that speech is unlawful. First Amendment protections apply regardless of whether government actions threaten speech rights directly or indirectly. The First Amendment forbids not only express prior restraints, but also *post hoc* punishment (including financial sanctions) unless and until the government meets its burdens of proving speech is unprotected and publication was knowingly illegal.

Here, the government contends, and the district court allowed, that the Appellants' assets may be seized based on allegations that they derived from illegal publishing and the government may hold and restrain all the assets while it pursues its unproven charges. This is wholly unprecedented in the law. The district court dismissed Supreme Court precedents and other cases barring pretrial seizures on the premise that they forbid only seizures of expressive materials as prior restraints, ignoring that the law also forbids punishment for speech or publishing not proved to be illegal.

The court also concluded that Appellants could not challenge the seizures of their assets because the government had previously seized the Backpage.com website, so Appellants could not claim that seizure and restraint of their assets would "interrupt the flow of expressive materials." In so doing, the court provided a perfect recipe for the government to inhibit speech rights: First seize or coerce the shutdown of a website or publication, then go after every person who held ownership interests, seizing all of their assets to ensure they are deprived of the resources necessary to defend against claims of illegal publishing. And, in the district court's view, after the *ex parte* seizures, the burden falls on the defendants who have lost their assets to prove that their "property is not contraband" and instead "originated from legitimate [publishing] activity." What publisher would not feel chilled if this is the threat and the process they face?

The government's theory in this case is that Appellants' assets may be seized because they are allegedly connected to illegal publishing activity, and that it need not prove, but only allege, that this is so. In no other context of First Amendment law has this ever been permitted, and it should not be allowed here. If the district court's theory is affirmed, the same analysis could be used to suppress speech by using forfeiture authority in ways that would undermine landmark First Amendment precedents, such as the Pentagon Papers case and many others.

## STATEMENT OF JURISDICTION

James Larkin, John Brunst, Michael Lacey, and Scott Spear (collectively "Appellants") appeal an order issued in the Central District of California ("CDCA") denying their motion to vacate or modify the government's *ex parte* pretrial seizures of publishing assets and proceeds from publishing activities, which amounts to a preliminary injunction that keeps the seizures in place. ER 5-17. This Court has jurisdiction to hear this appeal under 28 U.S.C. § 1292(a)(1), which confers appellate jurisdiction over orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). *See also In re Any & All Funds Held in Republic Bank of Ariz. Accounts*, 774 F. App'x 400, 401 (9th Cir. 2019) ("*Any & All Funds I*"). The Court also has jurisdiction under 28 U.S.C. § 1291 because the order below denied Appellants' constitutional objections and leaves them "out of court." *Davis v. Walker*, 745 F.3d

1303, 1308-10 (9th Cir. 2014). Finally, the Court has jurisdiction under the Collateral Order Doctrine recognized in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949).

## STATUTORY PROVISIONS

Pursuant to Circuit Rule 28-2.7, copies of pertinent constitutional provisions, statutes, and regulations appear in the addendum to this brief.

## STATEMENT OF THE ISSUE

Whether the First Amendment permits the government to effect *ex parte* seizures of assets based on allegations that they derive from illegal publishing with no proof or judicial determination that the publishing venture was illegal or that the seized assets were derived from unprotected speech.

## STATEMENT OF THE CASE

### A.    History of Backpage.com.

Appellants are former owners of a newspaper conglomerate that, at one time, published and distributed 17 weekly newspapers across the country, including the Phoenix New Times, SF Weekly, and New York's Village Voice. Appellants own Medalist Holdings, Inc. ("Medalist"), formerly known as New Times, Inc.; Larkin and Lacey own controlling interests, and Brunst and Spear own minority interests. Medalist is the parent company of Village Voice Media Holdings, LLC ("VVM"),

which owned the newspapers.[1]  The newspapers featured articles on political and cultural issues not typically covered by mainstream media, and received numerous awards for journalistic excellence, including a Pulitzer Prize.  Like other alternative weekly publications, the newspapers were free to readers, and depended on advertising revenue, including revenue from classified ads.  By the early 2000s, however, online classified advertising websites, such as Craigslist.org, had undermined the economic viability of newspaper classified advertising.

In response to this trend, VVM formed a subsidiary in 2004, Backpage.com, LLC, which launched a website ("Backpage.com") to publish third-party classified ads.  Ad categories spanned the full spectrum, including rentals, automotive, real estate, jobs, dating, and "adult services" (including escort ads), as had appeared in newspapers, yellow pages, and other media for decades.  *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012) (noting "numerous states license, tax and otherwise regulate escort services as legitimate businesses").  Over time, Backpage.com grew to become the second-largest online classified advertising website in the United States (after Craigslist.org), with third-party users posting millions of classifieds each month.  *See id.* at 1266.  VVM sold its interests in the

---

[1]  VVM is now known as Camarillo Holdings, LLC.

newspapers in 2013, and its interests in Backpage.com, LLC in 2015, both in leveraged buyouts.[2]

### B. Backpage.com's Litigation History.

As websites like Craigslist.org and Backpage.com gained a greater Internet presence, various governmental and non-governmental entities pressured them to remove their "adult" ads. *E.g.*, *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009). Craigslist.org caved under the pressure, but Backpage.com was unwilling to succumb to censorship, and litigation ensued. The government first investigated Backpage.com through grand jury proceedings in the Western District of Washington, but its novel theory of vicarious criminal liability collapsed after Judge Jones quashed its subpoenas as overbroad and excessively burdensome, noting he knew of no entity that ever faced criminal liability under such a theory.

Numerous courts have held that Backpage.com's publication of adult advertisements was protected under the First Amendment, that government authorities may not presume otherwise, and that the website and its operators and owners could not be liable under civil or criminal laws if some (or even many) individual users

---

[2] Backpage.com, LLC's then-Chief Executive Officer, Carl Ferrer, purchased Backpage.com, through entities he controlled, in April 2015. Medalist, through its subsidiaries, holds promissory notes for the balance of the purchase price from Ferrer's entities, and the notes (and other obligations) are secured with liens on essentially all assets relating to Backpage.com. Government seizures have blocked exercise of those lien rights.

posted ads on the site in connection with criminal acts.[3]  These cases included

unsuccessful efforts to prosecute former owners of Backpage.com for purportedly

promoting prostitution through operation of the website.  *People v. Ferrer*, 2016 WL

7237305 (Cal. Super. Ct. Dec. 16, 2016); *People v. Ferrer*, No. 16FE024013, slip

op. (Cal. Super. Ct. Aug. 23, 2017) ("*Ferrer II*") (dismissing as to Appellants Lacey

and Larkin all charges premised on ad revenues from Backpage.com allegedly repre-

senting proceeds of pimping).  As the Seventh Circuit observed, Backpage.com was

---

[3]  *See M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011) (dismissing claims against Backpage.com and finding website could not be liable under 18 U.S.C. § 2255 for aiding and abetting alleged sex trafficking); *McKenna*, 881 F. Supp. 2d 1262 (invalidating Washington law seeking to impose criminal liability on Backpage.com and recognizing escort ads as constitutionally protected speech); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013) (same for Tennessee law targeting Backpage.com); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 26, 2013) (same for similar New Jersey law); *Doe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015) (dismissing civil claims and holding that practices of website in publishing, screening, and editing third-party ads did not constitute participation in an illegal venture), *aff'd*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (sheriff's threats to credit card companies to cause them to terminate service to Backpage.com constituted unlawful informal prior restraint under First Amendment), *cert. denied*, 137 S. Ct. 46 (2016).  These courts acknowledged Backpage.com's use of automated filters to flag and block ads, words, and images that violated the site's terms of use, or were offensive or potentially improper, followed by two tiers of moderators to further review and block improper user posts.  *See McKenna*, 881 F. Supp. 2d at 1266-67 (Backpage.com used automated filters to screen for 26,000 terms, phrases, email addresses, URLs and IP addresses, and employed 100 personnel to review and block ads violating the website's terms of use); *Cooper*, 939 F. Supp. 2d at 814 (Backpage.com's monitoring blocked or removed one million ads in April 2012).

"an avenue of expression of ideas and opinions" protected by the First Amendment, including its "classified ads for 'adult' services." *Dart*, 807 F.3d at 230-31.

### C. Criminal Prosecution in Arizona.

Undeterred by numerous rulings recognizing publication of "adult" ads as expression the First Amendment protects, and emboldened by a Senate Permanent Subcommittee on Investigations report vilifying Backpage.com, the government commenced a prosecution in the District of Arizona against various individuals for their roles with the publisher. On March 28, 2018, prosecutors obtained a 93-count indictment charging Appellants with violating the Travel Act (18 U.S.C. § 1952), money laundering (18 U.S.C. §§ 1956, 1957), and conspiracy (18 U.S.C. § 371), based on their prior involvement with Backpage.com. *Any and All Funds Held in Republic Bank of Arizona*, No. 18-cv-06742-RGK-PJW (C.D. Cal.), ECF 6, Ex. 1, Att. A (subsequent references to "ECF" are to this docket, which comprises the record below). The government's novel theory is that a website publisher may be criminally liable for the content of classified ads by third parties, even if the publisher is responsible for neither the content of the ads nor the third-party conduct. The government also charged Backpage.com's current owners (Ferrer, Backpage.com, LLC, and several affiliates) in separate but related indictments in the

District of Arizona.  Ferrer and his companies pled guilty and Ferrer is cooperating with the government.[4]

On April 6, 2018, the indictment was unsealed, and the government arrested Appellants and searched Lacey's and Larkin's homes, seizing computers, jewelry, artwork, and other assets (using warrants authorizing the seizure of, among other things, any "evidence of wealth").  ECF 6 at 10.  At the same time, the government seized the Backpage.com website, and affiliated websites and domain names, in the related prosecution of Backpage.com, LLC.  On July 25, 2018, the government filed a superseding indictment adding seven additional counts to the original. The superseding indictment contains allegations seeking forfeiture of 26 real properties (some purchased before Backpage.com ever existed), 89 bank accounts, and 268 domain names.  ECF 6, Ex. 5.[5]  Most of the real properties seized and many of the bank accounts belong to Appellants; the balance belong primarily to Backpage.com, LLC, its affiliates, or Ferrer.  *See supra* note 2.

---

[4]   Ferrer's plea statements are disputed, and directly contradict his many sworn statements over a half-decade explaining that Backpage.com made efforts to screen, block, and remove improper third-party ads and to cooperate with law enforcement. *See, e.g.*, Ferrer Decl., *Backpage.com, LLC v. McKenna*, No. 2:12-cv-00954, Doc. 3 (W.D. Wash. June 4, 2012); Ferrer Decl., *Backpage.com, LLC v. Dart*, No. 1:15-cv-06340, Doc. 6 (N.D. Ill. July 21, 2015).  *See also supra*, note 3.

[5]   By the time of the Superseding Indictment, assets named in the forfeiture allegations were already seized or otherwise encumbered in civil actions, as described below.

## D.    *Ex Parte* Civil Seizures and Forfeiture Actions in California.

On a separate but parallel track in the CDCA, the government effected multiple pretrial seizures of Appellants' assets.  On March 28, 2018, it obtained *ex parte* civil seizure warrants authorizing it to seize millions of dollars of assets belonging to Appellants and their family members, as well as funds held in a bank account of Cereus Properties, LLC ("Cereus"), an entity owned by Appellants.  The government followed up with several additional waves of seizures, including by obtaining additional *ex parte* warrants in the CDCA on April 4, 9, and 26, June 4, and July 27, 2018, authorizing it to seize additional financial accounts of Appellants, their families, and Cereus.  All told, the government obtained at least 24 civil seizure warrants, through which it seized many millions of dollars from Appellants Lacey, Larkin, Brunst, and Spear, and millions more from Cereus.[6]  The government also obtained *lis pendens* on all real properties in which the Appellants hold interests.  *See* ECF 6 at 7-8.[7]

---

[6]    Appellants' accounts that were seized are entirely distinct from Ferrer's and Backpage.com's assets that the government had also seized.  Cereus is a subsidiary of Medalist.  Among other things, Cereus has managed real property it controlled and collected payments on promissory notes from the sale of VVM's newspapers and from the sale of Backpage.com.

[7]    Subsequent seizures targeted four trusts for the benefit of Larkin's children, trust funds held by Appellants' First Amendment counsel, Davis Wright Tremaine, and at least a dozen other instances involving accounts of 18 other law firms.

Each *ex parte* application for seizure warrants for Appellants' assets relied on essentially identical affidavits from U.S. Postal Inspector Lyndon A. Versoza. ECF 6, Ex. 1 at 1-55. The affidavits purported to show probable cause based on a theory that Appellants aided and abetted criminal activity through operation of Backpage.com, and that the seized assets all were allegedly derived from that publishing enterprise. Versoza asserted that the overwhelming majority of adult ads posted by third parties on Backpage.com were for prostitution or trafficking. He based this claim on his review of records of several prosecutions of third parties who had posted ads (although not mentioning that Backpage.com had cooperated in and supported government investigations and prosecutions) and on his asserted general "training and experience" that enabled him to identify words or phrases "consistent with sex trafficking" in ads that did not on their face propose any illegal conduct. ECF 6, Ex. 1 at 22-35; *see also* ECF 6 at 20-28.

The affidavits offered in support of the warrant applications did not seek to trace any assets to specific instances of alleged illegal ads or knowing publication of ads for illegal conduct. Rather, the government's theory for all of its seizure warrants was that the Backpage.com website as a whole was illegal and therefore all revenues or distributions of earnings from the website should be forfeited as criminal proceeds. ECF 6, Ex. 1 at 1-55. From this premise, the government sought and obtained warrants to seize and encumber Appellants' assets indiscriminately—

including their bank and investment accounts, homes, and moneys held in trust for their children. This also included assets that Appellants earned and obtained from decades of operation of the newspapers, long before creation of Backpage.com. ECF 6 at 12; *id.* Ex. 1.

All of the warrants were obtained and the seizures were effected *ex parte*, with no prior notice or adversary hearing, and no judicial finding that the assets were proceeds from illegal activities, unprotected by the First Amendment.

**E.    Motion to Vacate or Modify the Seizure Warrants and Prior Rulings.**

Appellants challenged the seizures in a motion filed on August 1, 2018 ("Motion to Vacate") asserting that the seizures violated the First, Fourth, Fifth, and Sixth Amendments. ECF 6 at 1-41. Appellants argued that the warrants should be vacated and all seized assets returned because the First and Fourth Amendments prohibit pre-conviction seizures of publishing assets or proceeds based on nothing more than a showing of probable cause, and, in any event, Appellants should have been accorded a prompt adversarial hearing. Separately, Appellants challenged the warrants as having been obtained through knowing or recklessly false statements and material omissions. ECF 6 at 11-41.

Rather than respond to the Motion to Vacate on the merits, the government sought and obtained an order staying all proceedings in the cases. ECF 79; ECF 85. Appellants sought review in this Court. The government did not file an opposition

to the opening brief, and instead filed a Motion for Limited Remand and to Amend Briefing Schedule, in which it said it now "agree[d] appellants are entitled to a determination of whether any First Amendment interest entitles them to a pretrial hearing to challenge the seizures." *Any and All Funds I*, No. 18-56455, Dkt. 49-1 at 12-13 (9th Cir. Mar. 21, 2019). It later admitted "appellants' claims that they did not get a hearing … on [] the sufficiency of the warrants and [] whether … First Amendment interests … support treating this matter differently from a typical civil seizure are well taken." *Id.*, Dkt. 54 at 10 (9th Cir. Apr. 5, 2019). After briefing and argument, this Court vacated the stay, denied the government's motion for a "limited remand," and returned the case to the district court to address the constitutional challenges to the pretrial seizures. *Any & All Funds I*, 774 F. App'x at 401.

## F.    The Decision on Remand.

The district court reviewed Appellants' Motion to Vacate, ordered further briefing on "the legal authority and legal basis [for the] motion[] and what standard the Court should apply," and gave the government an opportunity to respond. ECF 102. The court conducted no hearing or other proceedings, and on December 20, 2019, issued the order on appeal denying Appellants' Motion to Vacate. ER 5-17.

The court concluded that the First Amendment provided no protection against the government's seizures of Appellants' assets. It held that, because the assets seized "were allegedly directly implicated in criminal activity," the "ordinary legal

mechanism for civil forfeiture" applied.  ER 9.  The court distinguished Supreme Court and other cases invalidating pretrial seizures on the ground that they concerned ongoing businesses.  Observing that "Backpage had already ceased operation at the time these seizures took place," the court held that there was no constitutional protection from the government's actions because they would not interrupt "the flow of expressive materials."  ER 8.

The district court held the "exercise of the ordinary law of civil forfeiture in this case places no burden on any party's right to protected First Amendment expression."  ER 9.  While the assets are frozen and cannot be accessed or used by Appellants, the court thought it sufficient that Appellants "have the full opportunity to dispute their seizure."  *Id.*; *see also id.* at 6 (indicating Appellants could obtain return of the funds under Fed. R. Crim. P. 41(g) by demonstrating that they are entitled to the seized property, the property is not contraband, and the seizure was illegal).[8]  This appeal followed.  ER 1-4.

## STANDARD OF REVIEW

This Court reviews *de novo* all questions of law, statutory interpretations, interpretations of the Federal Rules of Criminal Procedure, and questions of *res*

---

[8]   The court also denied Appellants' Fourth Amendment claims challenging the sufficiency of the seizure warrants, ER 11-14, as well as Sixth Amendment claims based on the deprivation of funds needed to pay counsel.  *Id.* at 10-11.

*judicata. United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1144 (9th Cir. 2011). Also, in appeals concerning First Amendment issues, this Court "conduct[s] an independent review of the facts." *Berger v. City of Seattle*, 569 F.3d 1029, 1035, 1041 (9th Cir. 2009); *see also Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 567 (1995) (court has a "constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court … because the reaches of the First Amendment are ultimately defined by the facts").

## SUMMARY OF THE ARGUMENT

The district court decision approving the wholesale seizure of assets from individuals associated with an online publishing venture based on alleged but unproven allegations that publishing activity was illegal is unprecedented and would severely undermine First Amendment protections if allowed to stand. Until now, no court has ever approved a seizure of this type. The district court cited no authority to support its holding, nor has the government cited any case in which seizures such as this have been upheld over First Amendment objections. The decision below approved the pretrial seizure of publishing proceeds any time the government alleges the speech that gave rise to earnings is not constitutionally protected, and the district court's decision incorrectly held such a seizure does not impose a prior restraint.

The district court's holding conflicts with the most basic First Amendment principles. The government always has the burden of proof when it seeks to penalize speech, particularly when it alleges expression is not constitutionally protected. It is never permissible for the government to assume what it has the obligation to prove. Here, however, the district court *began* with the premise that the online publication that the government attacks (the Backpage.com website) was not constitutionally protected and so any of Appellants' funds that the government alleges has some connection to the website are presumptively illegal and forfeitable.

The district court compounded its misunderstanding of First Amendment restrictions by concluding that there can be no constitutional violation unless a seizure imposes a prior restraint on expressive materials. This too is entirely contrary to established law. As the Supreme Court has long made clear, the First Amendment governs all forms of restrictions on or punishment of speech—including imposing financial penalties for publishing. The First Amendment's reach is far greater than just the prevention of prior restraint, and the district court was mistaken in its view that the First Amendment offers no protection absent a party's showing that "the flow of expressive materials will be interrupted." ER 8.

If left to stand, the district court's ruling provides a foolproof formula for circumventing First Amendment protections of websites and other publishers the government disfavors. Based on nothing more than allegations that a website or

other publication facilitates illegal conduct by third-party users, authorities could seize the publication's assets as well as assets of the individuals who have ownership interests. Obviously, such tactics would severely undermine if not cripple any effective defense against the government's charges. As is apparent, that is the government's aim here.

Every court that has reached the issue of whether law enforcement officials may seize speech-related assets or freeze publishing proceeds prior to conviction has held such actions are unconstitutional. The district court's decision ignores the most basic rule of the First Amendment—that the government cannot penalize a publisher without *proving* at trial that the publication is unprotected by the First Amendment.

## ARGUMENT

### I. The District Court's Refusal to Vacate the Seizures Constitutes an Unprecedented Intrusion into First Amendment Protections for Publishers.

The seizures in this case are utterly without precedent and violate free speech principles that go to the heart of First Amendment jurisprudence. Until the district court's decision below, no case has permitted government authorities to seize a publisher's assets based on mere allegations the publication was illegal.

### A. The Order Violates Bedrock Principles of First Amendment Law.

The district court's premise that, "[a]s a threshold issue, commercial speech related to illegal activity is not protected under the First Amendment" hardly sets this case apart. ER 7. *Every case* in which the government seeks to penalize speech

must include the allegation that the matter at issue falls in an unprotected category, what this Court has described as "traditional narrow carve-outs to the First Amendment." *United States v. Sineneng-Smith*, 910 F.3d 461, 470 (9th Cir. 2018), *cert. granted*, 140 S. Ct. 36 (Oct. 4, 2019) (No. 19-67); *United States v. Stevens*, 559 U.S. 460, 468-69 (2010). Alleging speech is unprotected—as the government has done here—does not cancel First Amendment requirements; it is precisely when they kick in. However, the district court justified leaving the seizures in place only by ignoring this basic First Amendment rule.

### 1.    The Government Must Prove Speech is Unprotected.

The government's claim of authority to seize Appellants' assets is based solely on the theory that they are profits derived from (or commingled with) proceeds from allegedly illegal publishing activities. However, the district court's holding that "the assets in question do not merit special protection under the First Amendment," ER 7, *begins* with the proposition that the speech at issue is unprotected because it facilitated crime, which is the very point that must be established at trial. This gets First Amendment law backwards.

It is a fundamental requirement that speech is presumed protected, and the government always has the burden to prove otherwise. *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000). No doubt, certain narrowly framed and specifically defined categories of

speech fall outside the First Amendment's protection, including "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Sineneng-Smith*, 910 F.3d at 470 (quoting *Stevens*, 559 U.S. at 468). However, before speech may be deemed to fall into one of these unprotected categories, the Constitution erects high barriers and imposes the burden of proof on the government.[9] In all cases, the First Amendment bars the government from penalizing speech until *after* this burden is met.

In this case, the government supported its seizure warrant applications with affidavits from an investigator who stated his opinion that adult ads on Backpage.com were for prostitution and on his view that the website facilitated that advertising. However, the judgment of a law enforcement official cannot overcome the First Amendment presumption regarding the protected status of speech.[10]

---

[9]   *E.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (public officials must prove falsity of speech and actual malice to recover damages for defamation); *Miller v. California*, 413 U.S. 15, 23-25 (1973) (government must show that work, taken as a whole, meets three-part test to be considered obscene); *Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (government must prove that speaker intended to provoke commission of crime and that speech was likely to produce imminent crime to be considered incitement); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498-502 (1949) (for "speech integral to criminal conduct," the government must prove that the "sole immediate purpose" of speech is to foster a specific crime).

[10]   *E.g.*, *Stanford v. Texas*, 379 U.S. 476, 485 (1965); *Marcus v. Search Warrants of Prop. at 104 E. Tenth St.*, 367 U.S. 717, 731-32 (1961). *See Center for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 658 (E.D. Pa. 2004).

"Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

Allegations set forth in affidavits supporting the seizure warrants, and even a magistrate judge's *ex parte* probable cause finding, cannot discharge the government's burden of proof, because "[p]roviding a forum for online publishing is a recognized legal purpose" protected by the First Amendment. *Ferrer II*, slip op. at 13; *Dart*, 807 F.3d at 230. As numerous courts have ruled, the First Amendment's presumptive protections are not undone by government allegations that adult online classified ads are camouflaged prostitution ads.[11]

The government's argument that ads for prostitution are not protected by the First Amendment does not speak to the point that must be proven. The issue here is not whether prostitution ads are unprotected speech; it is whether providing a publishing platform is protected, even if it may have been used by others to commit

---

[11] *See*, *e.g.*, *McKenna*, 881 F. Supp. 2d at 1282 (discussing the legality of escort ads and state licensure of escort services); *Cooper*, 939 F. Supp. 2d at 816, 833-34 (ads on Backpage.com are protected speech under the First Amendment); *Hoffman*, 2013 WL 4502097, at *9-11 (rejecting state's claim that online escort ads are unprotected speech); *M.A.*, 809 F. Supp. 2d at 1049-50. *Cf. Doe v. Backpage.com LLC*, 104 F. Supp. 3d at 156-57 ("The existence of an escorts section in a classified ad service, whatever its social merits, is not illegal."); *Dart v. Craigslist*, 665 F. Supp. 2d at 968 ("We disagree … that the 'adult services' section is a special case. The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content.").

crimes. The distinction is critical, because "third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection." *McKenna*, 881 F. Supp. 2d at 1281-82 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 791 (2011)). What the government must prove—which is the point of having a trial—is that the publisher was directly responsible for illegal activity, not just that the ads were published.

To establish that a publisher's actions fall within the First Amendment exception for "speech integral to criminal conduct," the government must prove the "sole immediate purpose" of the publication was to further a specific criminal act. *Sineneng-Smith*, 910 F.3d at 481 (quoting *Giboney*, 336 U.S. at 498-502). Even a publisher's knowledge he is transmitting a third-party's "illegal speech" is not enough to render the publication "integral to criminal conduct" and outside First Amendment protection. *Bartniki v. Vopper*, 532 U.S. 514, 529-30 (2001). Nor is it sufficient to allege the publication had a "tendency … to encourage unlawful acts." *Free Speech Coal.*, 535 U.S. at 253-54; *United States v. Freeman*, 761 F.2d 549, 551-22 (9th Cir. 1985). The government has the burden to establish the publisher's specific intent *before* such speech may be deemed outside the First Amendment's protection. *Sineneng-Smith*, 910 F.3d at 482 (the "speech integral" exception

requires the government to show "specific intent to facilitate the commission of a crime").

For that reason, the government's pretrial allegations can *never* suffice to support a conclusion that a particular publication lacks First Amendment protection.[12] The Supreme Court made this clear in *Virginia v. Black*, 538 U.S. 343 (2003), a case assessing the constitutionality of a state statute that prohibited the burning of a cross with the intent to intimidate. The Court held that the state could ban such cross burnings as a type of "true threat," unprotected by the First Amendment, but it *could not* enforce the law using a rule that any cross burning was "prima facie evidence of an intent to intimidate." *Id*. at 363-65. The Court held "[t]he First Amendment does not permit such a shortcut," and that the state could not presume the expression was outside the First Amendment's protection. *Id*. at 367.[13] The

---

[12] Even at trial, proof of defendant's specific knowledge or intent cannot be satisfied via imputation of knowledge of alleged co-conspirators. *E.g.*, *United States v. Vallone*, 698 F.3d 416, 457 (7th Cir. 2012) (citing *Jefferson v. United States*, 340 F.2d 193, 197-98 (9th Cir. 1965)); *United States v. Spock*, 416 F.2d 165, 173 (1st Cir. 1969). "Where a conspiracy implicates First Amendment protections such as freedom of association and freedom of speech, the court must make a 'specially meticulous inquiry' into the government's evidence so there is not 'an unfair imputation of the intent of some participants to all others.'" *United States v. Stone*, 2012 WL 1034937, at *2 (E.D. Mich. Mar. 27, 2012) (quoting *United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972)). *See also generally NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918-24, 933-34 (1982).

[13] This Court has applied this rule as well, holding in such cases that "the element of intent [is] the determinative factor separating protected expression from unprotected criminal behavior." *United States v. Gilbert*, 813 F.2d 1523,

district court was able to arrive at its threshold premise—that "commercial speech related to illegal activity is not protected under the First Amendment," and that the government "seized proceeds that were allegedly directly implicated in criminal activity"—only through the circular route of assuming what the government has the burden to prove. The Constitution never permits penalizing speech before the government proves the expression involved is unprotected by the First Amendment. Yet that is precisely what happened in this case.

### 2. First Amendment Harm Includes More Than Just Prior Restraints.

The second key premise of the district court's decision is its erroneous assumption that seizures violate the First Amendment only if they impose a prior restraint. The court's view was that the concern with an *ex parte* seizure of publishing-related assets is only "whether the flow of expressive materials will be interrupted," so that "arguably protected speech will in fact be stifled." Observing that the government had already seized and shut down the Backpage.com website

---

1529 (9th Cir. 1987). It has held, for example, that "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." *United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005); *United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011) (the subjective test set forth in *Black* must be read into all threat statutes). *See also Fogel v. Collins*, 531 F.3d 824, 829-33 (9th Cir. 2008) (same result under either objective or subjective test).

when the seizures at issue here occurred, the court concluded that proceeds from a publishing business have no heightened status under the First Amendment. ER 8.

The district court misconstrued what is at issue here, and again fundamentally misstated First Amendment law. Seizing a publisher's assets implicates the First Amendment regardless of whether he or she plans to use the assets to disseminate future publications. The government's theory here, which the district court sanctioned, is that assets can be taken *because they are related to publishing* the government alleges was illegal. Seizing assets in this way from a publisher—or, as in this case, from individuals who hold ownership interests in a publishing venture—is to impose a penalty for publishing. Imposing penalties for unproven allegations about past speech or publishing violates the First Amendment whether or not they also cause prior restraint.

Since the dawn of free speech doctrine, the Supreme Court has made clear the First Amendment protects against more than just prior restraint. In its first case upholding protections for freedom of the press, the Court held "the mere exemption from previous restraints cannot be all that is secured by the constitutional provisions." *Near v. Minnesota*, 283 U.S. 697, 715 (1931). It stressed that "liberty of the press might be rendered a mockery and a delusion, and the phrase itself a by-word, if, while every man was at liberty to publish what he pleased, the public authorities might nevertheless punish him." *Id*. It has been the law ever since that

preventing prior restraint "cannot be deemed to exhaust the conception of the liberty guaranteed by State and Federal constitutions." *Id*. at 714-15.

The Court in *Near* explained that the government cannot evade constitutional limits by calling its action a sanction on "the 'business' of publishing defamation" rather than as a limit on publication. "Characterizing the publication as a business, and the business as a nuisance," the Court observed, "does not permit an invasion of the constitutional immunity against restraint." Additionally, "it does not matter that the newspaper or periodical is found to be 'largely' or 'chiefly' devoted to the publication of such derelictions." 283 U.S. at 720.

Ever since *Near*, the Supreme Court has held repeatedly that laws restricting or suppressing speech "may operate at different points in the speech process," including (1) "restrictions requiring a permit at the outset," (2) "imposing a burden by impounding proceeds on receipts or royalties," (3) "seeking to exact a cost after the speech occurs," or (4) "subjecting the speaker to criminal penalties." *Citizens United v. FEC*, 558 U.S. 310, 336-37 (2010) (citations omitted). Any government action to impede publishing in advance, or penalizing it after the fact, is a potential abridgment of the freedom of speech or the press.

This was made clear in another early case where the Supreme Court held the First Amendment prohibited use of contempt power to summarily fine newspapers for publishing editorials that discussed ongoing judicial proceedings. In *Bridges v.*

*California*, 314 U.S. 252 (1941), the Court struck down contempt orders against the *Los Angeles Times* and others for articles that touched on pending litigation. The trial court had issued contempt orders imposing fines ranging from $100 to $300 based on findings that the publications interfered with the orderly administration of justice. *Id*. at 271. However, the Supreme Court held the summary fines violated the First Amendment, and that allowing such sanctions would "destroy the historic constitutional meaning of freedom of speech and of the press." *Id*. at 268.

The Court did not ask whether the contempt sanctions might interrupt the flow of expressive materials, as did the district court in this case, nor did it speculate about "whether arguably protected speech will in fact be stifled." ER 8. It made no suggestion—as the government insists here—that the First Amendment is implicated only if the sanctions pose a threat to the existence of "ongoing businesses." No one could reasonably suggest that the *Los Angeles Times* might fold when confronted with contempt fines of a few hundred dollars. Nevertheless, the Supreme Court held that the summary penalties violated well-established First Amendment norms.

There is good reason for this. The Court has always interpreted the First Amendment as barring government authorities from imposing financial burdens on speech (either before or after publication) and has never required a showing that the publication was suppressed as a result. The Framers of the Constitution were quite familiar with the English practice of imposing "taxes on knowledge," and adopted

the First Amendment as a hedge against this "long history of hostile misuse against the freedom of the press." *Grosjean v. American Press Co.*, 297 U.S. 233, 247-50 (1936). *See also Timbs v. Indiana*, 139 S. Ct. 682, 687-90 (2019) (tracing history of use of financial sanctions to punish disfavored speakers). Likewise, it is well-established that depriving writers and publishers of compensation for their work violates the First Amendment.[14]

This principle also was established in cases involving the civil rights movement. In *NAACP v. Alabama*, 357 U.S. 449 (1958), the Supreme Court reviewed a state court order finding the NAACP in contempt for failure to disclose its membership lists to state officials. A state court had issued an *ex parte* order restraining the organization from engaging in further activities in the state and forbidding it to take any further steps to qualify to do business. Another state court order held the NAACP in contempt and imposed a $100,000 fine. The Supreme Court held the state's actions violated the NAACP's First and Fourteenth Amendment rights, but

---

[14]  *See United States v. National Treasury Emps. Union*, 513 U.S. 454, 468-69 (1995); *Playboy Entm't Grp.*, 529 U.S. at 812 (reducing profitability of a business can infringe the First Amendment); *Matal v. Tam*, 137 S. Ct. 1744 (2017) (denial of economic benefits of trademark registration violates the First Amendment); *cf. Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 583-84 (1983) (special taxes on the press violate the First Amendment).

found it unnecessary to address the restraining order, holding that the monetary penalty alone was the violation.  *Id*. at 466-67.[15]

There is simply no basis in the law for the view that seizing assets because they allegedly relate to challenged publishing activities implicates the First Amendment only when doing so threatens an "ongoing business."  The opposite is true— government-imposed financial burdens can violate the First Amendment, even when the monetary impact is modest.  *Minneapolis Star*, 460 U.S. at 578-79 (use tax on newsprint and ink); *Grosjean*, 297 U.S. at 240 (two percent gross receipts tax on newspapers); *Bridges*, 314 U.S. at 271 (small fines for contempt).  This too is founded on a fundamental principle:  "The distinction between laws burdening and laws banning speech is but a matter of degree."  *Playboy Entm't Grp.*, 529 U.S. at 812.

The district court was plainly wrong in its reasoning that the seizures of Appellants' assets on allegations of illegal publishing could warrant First Amendment protection only if Appellants established that they were engaged in an ongoing business and the seizures would directly interrupt "the flow of expressive materials."

---

[15]  *See also NAACP v. Alabama*, 357 U.S. at 461 ("The governmental action challenged may appear to be totally unrelated to protected liberties.  Statutes imposing taxes rather than prohibiting particular activity have been struck down when perceived to have the consequence of unduly curtailing the liberty of freedom of press.").

The First Amendment demands and protects much more, yet neither the government nor the district court has ever addressed these basic principles.

### B. The District Court's Holding Would Empower the Government to Discipline Publishers or Speakers Whenever it Alleges Speech is Unprotected.

The implications of the district court's reasoning are staggering. If the government may seize publishing proceeds on a mere showing of probable cause whenever (a) it alleges the speech is unprotected by the First Amendment, and (b) the seizure does not terminate the operation of a publishing business, it would entirely undermine the fundamental basis of much First Amendment law. The decision opens a massive loophole that would allow the government to circumvent many critical precedents that protect freedom of speech and of the press. Here are just a few examples to illustrate the point:

**The Pentagon Papers.** In *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971), the Supreme Court held the First Amendment barred the government from enjoining the *New York Times*' and *Washington Post*'s publication of the "Pentagon Papers," a classified study entitled "History of U.S. Decision-Making Process on Viet Nam Policy." The government had argued the First Amendment did not protect publishing such material, allegedly in violation of the Espionage Act, where the disclosure "would pose a 'grave and immediate danger to the security of the United States,'" Brief for the United States, *N.Y. Times Co. v. United States*, 403 U.S. 713

(1971) (Nos. 1873-1885), 1971 WL 167581, at \*7, but the Court held that the United States had failed to satisfy the heavy burden required to justify a prior restraint. It is a landmark precedent of First Amendment law. ENCYCLOPEDIA BRITANNICA (https://www.britannica.com/topic/Pentagon-Papers) (describing it as "one of the most significant prior restraint cases in history").

However, the logic of the district court in this case would permit the government to circumvent the Pentagon Papers ruling so long as the government imposes financial penalties rather than a prior restraint. Espionage Act penalties include forfeitures for those convicted of the unauthorized communication or transmission of national defense information. 18 U.S.C. § 794(d) (providing for forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation"). Had Richard Nixon's Justice Department applied the district court's theory, it would have been able to conduct an *ex parte* seizure of profits from the *New York Times* and *Washington Post* (and their owners) simply by alleging probable cause to find that the publication fell into a category of unprotected speech. So long as the seizures did not force the newspapers to close their doors, there would be no First Amendment problem, according to the ruling below.

**Civil Rights Cases.** In *Claiborne Hardware Co.*, 458 U.S. 886, the Supreme Court held the NAACP's boycott activities in Mississippi were protected by the First

Amendment. It rejected rulings of Mississippi courts that NAACP's speech was unprotected because of the advocacy of violence, and that had enjoined boycott activities and ordered restitution to affected businesses. Although the Supreme Court agreed the First Amendment does not protect violence, it held that the context of political advocacy "imposes a special obligation on this Court to examine critically the basis on which liability was imposed," and that "intent must be judged according to the strictest law." *Id*. at 915-19 (internal quotation marks omitted). It is a key precedent in civil rights law.[16]

These controlling principles would be seriously undermined if the district court's view of the law prevails. The government would need only to allege that such advocacy threatened "serious bodily injury to any other person" or destruction or damage to "any structure, conveyance, or other real or personal property within the United States" (or that a person or group attempted or conspired to do so) in order to claim speech is unprotected by the First Amendment. 18 U.S.C. §§ 2332b(a)(1)(B) and (a)(2). Under the theory accepted below, once the

---

[16] *See*, *e.g*., George C. Covington, *Constitutional Law–The First Amendment and Protest Boycotts: NAACP v. Claiborne Hardware Co*., 62 N.C. L. REV. 399, 408, 413-14 (1984) ("[I]ndividuals from the American Revolution to the civil rights struggle of the 1960s have used the protest boycott as one of the most effective tactics to apply pressure where it hurts (the pocketbook), and thus hasten needed social change …. Dr. Martin Luther King's use of the protest boycott during the Civil Rights movement further helped to establish the special legitimacy of such activity.").

government establishes probable cause to believe such threats occurred, it would be able to seize the assets of the offending individuals or organizations under 18 U.S.C. § 981(a)(1)(G)(i).  This would present no First Amendment issue whatsoever, according to the government and the district court, so long as the seizure doesn't close down the organization entirely.

**Cases Involving Sexually Oriented Speech.**  Another obvious area of First Amendment law that would be scrambled by the district court's theory involves the regulation of sexually oriented materials, where courts have frequently acted to block government overreach.  In *PHE, Inc. v. DOJ*, 743 F. Supp. 15 (D.D.C. 1990), the court granted a preliminary injunction under the First Amendment to restrain DOJ from using or threatening to use its authority—including multiple simultaneous and/or consecutive obscenity prosecutions—to coerce purveyors of constitutionally protected, sexually oriented materials into ceasing distribution.  *See also PHE, Inc. v. DOJ*, 1993 WL 455944 (D.D.C. Oct. 26, 1993).  The court in *PHE, Inc.* blocked the government from circumventing constitutional requirements through the use of abusive tactics.  But under the district court's rule here, the government could simply shift to a different abusive strategy—the misuse of forfeiture authority—to punish disfavored publishers.  The government would only need to establish probable cause that a company had distributed some obscene material in violation of Chapter 71 of

Title 18 of the U.S. Code, and could then seize associated proceeds under 18 U.S.C. § 1467(c).

It could do the same to undermine Supreme Court precedents that have curtailed government overreach in combatting child pornography. The Court has made clear that the First Amendment does not permit the regulation of protected speech in order to prevent child pornography merely "because it resembles [unprotected material]," *Free Speech Coal.*, 535 U.S. at 255, and has held the government must prove scienter. *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994). Applying these principles, courts have blocked overzealous officials from seizing materials alleged to constitute child pornography, including the film *The Tin Drum*, winner of the Academy Award in 1979 for Best Foreign Language Film.[17] However, under the approach the district court approved, the government could avoid established First Amendment limits simply by alleging material is child pornography under 18 U.S.C. §§ 2252, 2252A or 2260, and seizing any proceeds from its sale (or any other assets with which those proceeds were commingled). *See*, *e.g.*, 18 U.S.C. §§ 2253-2254; § 981(a)(1)(C). By using the procedure approved in this case, these seizures

---

[17] *See*, *e.g.*, *Oklahoma ex rel. Macy v. Blockbuster Videos, Inc.*, 1998 WL 1108158 (W.D. Okla. Oct. 20, 1998); *cf. Camfield v. City of Oklahoma City*, 248 F.3d 1214 (10th Cir. 2001).

could be accomplished *ex parte*, without any judicial finding on the constitutional status of the material.

## C. The District Court Misanalyzed First Amendment Cases That Have Invalidated Seizures.

Neither the government nor the court below can point to a single case where a preemptive seizure of publishing assets or proceeds has been attempted or approved by any court. Nor is there any discussion in the decision below about how such a seizure could be reconciled with established First Amendment jurisprudence. Rather than citing supporting case law, the government and court below merely try to distinguish the cases where pre-conviction seizures were invalidated on First Amendment grounds. For the following reasons, they are wrong.

### 1. Pre-Conviction Seizures and Asset Freezes Have Been Invalidated in Every Case.

Every court that has reached the issue of whether the government may seize speech-related assets or freeze publishing proceeds prior to conviction has held the government's actions were unconstitutional. In *Fort Wayne Books v. Indiana*, 489 U.S. 46, 51 (1989), the Supreme Court invalidated a section of the Indiana RICO law that authorized pretrial seizures of assets "subject to forfeiture" on a showing of probable cause.[18] Despite the fact that the materials at issue could be forfeitable

---

[18] Assets "subject to forfeiture" under the Indiana law included all "property, real and personal, that 'was used in the course of, intended for use in the course of,

*upon conviction*, the Court held "the seizure at issue here unconstitutional." *Id.* at 65.[19] The Court limited its specific holding to the state's seizure of expressive materials. *Id*. at 62-63.

This Court applied *Fort Wayne Books* to invalidate federal RICO pretrial forfeiture provisions in *Adult Video Ass'n v. Reno*, 41 F.3d 503 (9th Cir. 1994) (re-adopting holding invalidating pretrial forfeitures as set forth in *Adult Video Ass'n v. Barr*, 960 F.2d 781 (9th Cir. 1992)). It found "the reasoning of *Fort Wayne Books* is equally applicable to the federal RICO statute," whose authorization of pretrial forfeitures of constitutionally protected materials "is unconstitutional on its face." *Barr*, 960 F.2d at 788. The Court explained "[t]he First Amendment will not tolerate such seizures until the government's reasons for seizure weather the crucible of an adversary hearing." *Id*. It reiterated that probable cause is not a sufficient showing to support a forfeiture order. *Id*.[20]

---

derived from, or realized through' … racketeering activity." *Fort Wayne Books*, 489 U.S. at 51.

[19] The Supreme Court held the forfeiture order unconstitutional even though defendants in that case had 39 prior convictions for violating the state's obscenity laws as predicate offenses, and despite assuming the materials subject to seizure were, in fact, obscene.

[20] As in *Fort Wayne Books,* the constitutionality of seizing non-expressive materials was not part of *Barr*'s facial challenge, so the court did not rule on it. *Barr*, 960 F.2d at 788 n.6 ("Because Adult Video does not challenge the other pre-trial procedures authorized by section 1963(d), we need not address their constitution-ality.").

Although *Fort Wayne Books* and *Adult Video Ass'n* both limited their holdings to the constitutionality of seizing expressive materials, the same principles govern pretrial seizures of publishing proceeds. *See American Library Ass'n v. Thornburgh*, 713 F. Supp. 469, 484 n.19 (D.D.C. 1989) ("pre-trial seizure of non-expressive material [including printing presses, bank accounts, etc.] *ex parte* from a business engaged in distributing expressive material also is unconstitutional"), *rev'd on standing grounds sub nom. American Library Ass'n v. Barr*, 956 F.2d 1178, 1194-96 (D.C. Cir. 1992).

The Supreme Court addressed the First Amendment implications of encumbering publishing proceeds in *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. 105 (1991). The Court held that the government cannot "freeze" profits from sale of a book under the so-called "Son of Sam" law that authorized the escrow of proceeds of crime and prejudgment attachment procedures to ensure that wrongdoers "do not dissipate their assets."[21] The Court assumed, without deciding, that income derived from expressive activity escrowed by the law "represent[ed] the fruits of crime" but, nevertheless, held the law was

---

[21] *Simon & Schuster*, 502 U.S. at 111. In this regard, the purpose of the infirm statute was identical to the RICO forfeiture provisions struck down in *Barr*, 960 F.2d at 783 (enjoining 18 U.S.C. § 1963(d) authorizing government action "to preserve the availability of property … for forfeiture").

"presumptively inconsistent with the First Amendment" to the extent it "imposes a financial burden on speakers because of the content of their speech." *Id*. at 115, 119.

The Court observed that the "Son of Sam" law supplemented New York's existing forfeiture scheme, including provisions authorizing forfeiture of proceeds of crime and prejudgment attachment procedures. *Id*. at 111. Assessing those factors, the Court had no difficulty holding New York's law violated the First Amendment even though it targeted only past speech, not ongoing publishing, and the penalty involved encumbering only money, not "expressive assets." Various similar state laws likewise have been invalidated as unconstitutional.[22] The holdings in these cases fully apply to the pre-conviction seizures at issue here, and there are no contrary decisions.

---

[22] *See Seres v. Lerner*, 102 P.3d 91, 97-98 (Nev. 2004) (invalidating Nevada law creating special cause of action allowing victims to sue to recover "all proceeds, regardless of the extent to which the work relates to the crime against the victim"); *Keenan v. Superior Ct.*, 40 P.3d 718, 726 (Cal. 2002) (invalidating California law that confiscates "all income from expressive materials, whatever their general themes or subjects"); *In re Opinion of Justices to the Senate*, 764 N.E.2d 343, 350-351 (Mass. 2002) (finding Massachusetts' proposed "Son of Sam" law violated the First Amendment); *Curran v. Price*, 638 A.2d 93 (Md. 1994) (invalidating Maryland law because of financial restrictions it placed on crime-related expression); *see also State ex rel. Napolitano v. Gravano*, 60 P.3d 246, 255 (Ariz. App. Ct. 2002) (upholding Arizona law to the extent forfeiture is restricted to specific proceeds of racketeering and defendant is accorded full due process *before* seizure, including an adversary proceeding where state has burden of proof).

## 2.      The District Court Failed to Distinguish This Case.

The district court's attempt to explain away these cases is unavailing. Discussing cases like *Fort Wayne Books* and *Adult Video Ass'n*, the court concluded that "profits extracted from a publishing business" have no "heightened status under the First Amendment" because the court erroneously focused only on "*where or how they [the profits] are subsequently used*." ER 8 (emphasis added). This misses the point. The First Amendment protects not just future speech, it also bars the government from penalizing past speech. Because the district court overlooks this fundamental fact, it misconstrues the cases involving forfeitures and articulates a totally unworkable and dangerous constitutional standard.

The district court's "fundamental concern" about "whether the flow of expressive materials will be interrupted," ER 8, hardly exhausts the circumstances in which imposing financial burdens on publishers violates the Constitution. It is no doubt true that the primary issue in *Fort Wayne Books* and *Adult Video Ass'n* was the problem of prior restraint, as both cases involved the seizure of expressive materials. However, nothing in those cases suggests the government may raid the bank accounts of a publisher or its owners with impunity when the government objects to the contents of a publication. While the seizure of books and videos presents an *obvious* First Amendment problem, it is far from the *only* problem.

The district court's holding that seizure of non-expressive assets creates a First Amendment issue only if doing so poses a threat to a publication's continuing operation has no legal support. ER 8 (quoting *American Library Ass'n*, 713 F. Supp. at 484 n.19). Its conclusion cannot be reconciled with a long line of cases holding that the First Amendment does not permit the government to impose financial burdens on speech, even where doing so does not present an existential threat or otherwise impede the flow of published material. *See*, *e.g.*, *Bridges*, 314 U.S. at 271 (minimal fine violates the First Amendment); *NAACP v. Alabama*, 357 U.S. at 466-67 (fine for contempt violates the First Amendment even where no prior restraint is imposed). As explained above, wide swaths of First Amendment law would be undone if the government could seize publishing proceeds based on unproven claims that speech falls in an unprotected category. *See supra* 29-34.

Moreover, the district court's proposed standard—that seizures of publishing proceeds are unconstitutional only if they may affect "whether the business is able to continue functioning or not"—is utterly unworkable. This is hardly surprising, as there is no body of case law to explain how such a standard could be implemented. It is a sort of "Evil Goldilocks" rule: asset seizures are permissible only so long as they are *just right*. After that point, if they threaten the viability of the business, they become plainly unconstitutional.

This practical problem is compounded by the district court's conclusion that this case involved no prior restraint because "Backpage had already ceased operation at the time these seizures took place," ER 8, a statement that is both troubling and ironic. The statement is troubling because it gives judicial imprimatur to the tactics employed in this case, where the government pressured the current owner of Backpage.com to terminate the website while it simultaneously seized the assets of the former owners and officers. If approved by this Court, it will provide a blueprint for other actions to censor publications without formal process and at the same time punishing anyone who was ever involved with it, while simultaneously undermining their ability to mount a defense.

It is ironic because, under the district court's rule, the government would not have been able to seize the website as an ongoing operation or confiscate the assets of its current owner. It thus creates a powerful incentive to use informal pressure tactics as a tool of censorship, which the Supreme Court has described as "a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *Dart*, 807 F.3d at 237 ("Unwittingly, the judge was suggesting a formula for permitting unauthorized, unregulated, foolproof, lawless government coercion.").

The district court's assumption that the law is concerned only with prior restraints is also dashed by *Simon & Schuster,* where the Supreme Court held the impoundment of publishing proceeds is unconstitutional without the need to show any future impact on "the flow of expressive materials." Nevertheless, it held that encumbering the profits from publication was a First Amendment injury without regard to any impact on past or future works.

The district court's principal effort to distinguish *Simon & Schuster* is based on the conclusion that the "Son of Sam" law's problem was that it imposed an overly broad, content-based speech regulation. ER 9. This, however, confuses the constitutional injury with the specific mechanism of enforcement. Ever since *Near v. Minnesota*, 283 U.S. 708-09, the Supreme Court has evaluated government actions by their "operation and effect," not the particular form they take. The constitutional *injury* is the financial burden that is imposed on presumptively protected speech, and the Court in *Simon & Schuster* merely applied the established rule that a law "is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." 502 U.S. at 115. The *mechanism* of enforcement may vary, from an unconstitutional tax, a contempt sanction, a pre-conviction seizure (as in this case), or a content-based escrow requirement (as in *Simon & Schuster*).

The district court's recitation of specific differences between operation of the "Son of Sam" law and the seizures in this case fails to address the overarching constitutional problem. It points out the government here used "the ordinary legal mechanism for civil forfeiture," ER 9, while in *Simon & Schuster*, the New York State Crime Victims Board ordered an author to turn over payments he had received, and the publisher to turn over all funds payable to the author. 502 U.S. at 115. The district court states that the publishing proceeds "were allegedly directly implicated in criminal activity," ER 9, while in *Simon & Schuster*, the Supreme Court said the law treated all income derived from affected publications as "the fruits of crime." 502 U.S. at 115. None of these particular details alter the essential point: the "Son of Sam" law violated the First Amendment because it imposed a financial penalty on speech through enforcement of content-based law; the seizures in this case impose a financial penalty on speech with no judicial determination that Appellants' publishing activities lack First Amendment protection. All the case law supports vacating these seizures.

**D.      The District Court's Order Improperly Reverses the Burden of Proof.**

The district court incorrectly concluded that the "ordinary mechanism for civil forfeiture … places no burden on any party's right to protected First Amendment expression" because Appellants "have the full opportunity to dispute their seizure." ER 9. A party seeking to challenge an unlawful seizure of property must move for

the property's return under Federal Rule of Criminal Procedure 41(g) or seek its return in an ensuing civil forfeiture action. In such proceedings, the claimant bears the burden of proof, *Omidi v. United States*, 851 F.3d 859, 863 (9th Cir. 2017), must present evidence to support its motion or claim, and must establish the seizure was illegal. *United States v. Harrell*, 530 F.3d 1051, 1057 (9th Cir. 2008).

Requiring a claimant to prove his speech was legal is the exact opposite of how the First Amendment operates, which places the burden on the government to prove that the expression it seeks to penalize is illegal and unprotected. In every case where the government restricts speech, whether by direct censorship, criminal prosecution, or financial sanction, it must prove speech is unprotected *before* it may act. *See supra* 18-23. But the district court approved massive seizures of proceeds from an online publication with no such judicial determination. These seizures were in no way "ordinary," and the district court's suggestion that Appellants may prove the legality of their past publishing activities is no answer to the grave First Amendment issues presented.

## CONCLUSION

For the foregoing reasons, Appellants respectfully urge that this Court should reverse the District Court's order denying Appellants' Motion to Vacate, and issue an order vacating the seizures to prevent further deprivation of their constitutional rights.

RESPECTFULLY SUBMITTED this 21st day of January, 2020.

James C. Grant
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA  98104
Telephone:  (206) 622-3150
Facsimile:   (206) 757-7700
Email:  jamesgrant@dwt.com

Robert Corn-Revere
Ronald G. London
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800
Washington, DC  20006
Telephone:  (202) 973-4200
Facsimile:   (202) 973-4499
Email:  bobcornrevere@dwt.com
         ronaldlondon@dwt.com

Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN PC
903 Calle Amanecer
Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
Email:  tbienert@bienertkatzman.com
         wbernstein@bienertkatzman.com

Paul John Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME
    CAMBRIA LLP
42 Delaware Avenue
Suite 300
Buffalo, NY 14202-3857
Telephone: (716) 849-1333
Email:  pcambria@lglaw.com
         eparis@lglaw.com

Bruce Feder
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road
Suite 160
Phoenix, AZ 85016
Direct: (602) 257-0135
Email:  bf@federlawpa.com

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER,
    WOLPERT, NESSIM, DROOKS,
    LINCENBERG & RHOW P.C.
Suite 2300
1875 Century Park East
Los Angeles, CA 90067-2561
Telephone: (310) 201-2100
Email: glincenberg@birdmarella.com
         aneuman@birdmarella.com
         gpanchapakesan@birdmarella.com

# ADDENDUM OF CONSTITUTIONAL AND STATUTORY PROVISIONS

United States Constitution, First Amendment:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

United States Constitution, Fourth Amendment:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, counsel for James Larkin, John Brunst, Michael Lacey, and Scott Spear represent that they are not aware of any other related cases pending in this Court.

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the requirements of Cir. Rule 32, because it is proportionately spaced in Times New Roman 14-point type, and according to the word processing system used to prepare it, and in accordance with Circuit Rule 32(a)(7)(B), the word count of the brief is 10,525.

DATED this 21st day of January, 2020.

DAVIS WRIGHT TREMAINE LLP

By s/*Robert Corn-Revere*

Robert Corn-Revere
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
Tel: (202) 973-4200
Fax: (202) 973-4499
Email: bobcornrevere@dwt.com

Attorneys for Appellants