# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

No. 19-56510

_____

In re: ANY AND ALL FUNDS HELD IN REPUBLIC BANK OF ARIZONA
ACCOUNTS XXXX1889, XXXX2592, XXXX1938, XXXX2912, AND
XXXX2500,

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JAMES LARKIN, Real Party in Interest Defendant; JOHN BRUNST, Real Party
in Interest Defendant; MICHAEL LACEY, Real Party in Interest Defendant;
SCOTT SPEAR; Real Party in Interest Defendant,
*Movants-Appellants*.

_____

On Appeal from United States District Court for the Central District of California
The Honorable R. Gary Klausner, United States District Judge

_____

## REPLY BRIEF OF APPELLANTS JAMES LARKIN,
## JOHN BRUNST, MICHAEL LACEY AND SCOTT SPEAR

_____

James C. Grant
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 622-3150
Facsimile: (206) 757-7700
Email: jamesgrant@dwt.com

Robert Corn-Revere
Ronald G. London
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800
Washington, DC 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
        ronaldlondon@dwt.com

*Additional Counsel Listed on Next Page*

*List of Additional Counsel*

Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN PC
903 Calle Amanecer
Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
Email:  tbienert@bienertkatzman.com
         wbernstein@bienertkatzman.com

Paul John Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME
    CAMBRIA LLP
42 Delaware Avenue
Suite 300
Buffalo, NY 14202-3857
Telephone: (716) 849-1333
Email:   pcambria@lglaw.com
          eparis@lglaw.com

Bruce Feder
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road
Suite 160
Phoenix, AZ 85016
Direct: (602) 257-0135
Email:   bf@federlawpa.com

Gary S. Lincenberg
Ariel A. Neuman
BIRD, MARELLA, BOXER,
    WOLPERT, NESSIM, DROOKS,
    LINCENBERG & RHOW P.C.
Suite 2300
1875 Century Park East
Los Angeles, CA 90067-2561
Telephone: (310) 201-2100
Email: glincenberg@birdmarella.com
         aneuman@birdmarella.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 3

I. THE GOVERNMENT CANNOT AVOID THE ISSUE ON APPEAL BY MISDIRECTION ..................................................................................... 3

    A. The Government's First Amendment Arguments Seek to Distract From the Question Presented..................................................... 3

    B. The Government Treats Accusations as Proof of Guilt ......................... 7

II. THE GOVERNMENT CONFIRMS THESE SEIZURES ARE UNPRECEDENTED AND LACK CONSTITUTIONAL SUPPORT ......... 13

    A. The Government Essentially Concedes Pretrial Asset Seizures Are Impermissible Under Basic First Amendment Principles............ 13

    B. The Government Can Identify No Precedent Supporting Seizures of Publishing Assets Based on Probable Cause ................... 16

III. THE GOVERNMENT'S JURISDICTIONAL ARGUMENTS SHOULD AGAIN BE REJECTED. ........................................................... 20

    A. Challenges to Appellate Jurisdiction Under this Court's Prior Ruling and 28 U.S.C. § 1292(a)(1) Cannot Prevail ........................... 20

    B. Denial of the Motion to Vacate the Seizures is an Immediately Appealable Collateral Order................................................................ 23

    C. *DiBella v. United States* Does Not Apply to This Case ...................... 25

CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adult Video Ass'n v. Barr*,
  960 F.2d 781 (9th Cir. 1992) .......................................................16, 17

*Adult Video Ass'n v. Reno*,
  41 F.3d 503 (9th Cir. 1994) .............................................................17

*Alexander v. United States*,
  509 U.S. 544 (1993)...........................................................................28

*American Library Ass'n v. Thornburgh*,
  713 F. Supp. 469 (D.D.C. 1989), *rev'd on standing grounds*
  *sub nom. American Library Ass'n v. Barr*, 956 F.2d 1178
  (D.C. Cir. 1992) ................................................................................17

*Andersen v. United States*,
  298 F.3d 804 (9th Cir. 2002) ...............................................26, 27, 28

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d 805 (M.D. Tenn. 2013) ....................................*passim*

*Backpage.com, LLC v. Dart*,
  807 F.3d 229 (7th Cir. 2015) ........................................................6, 10

*Backpage.com, LLC v. Hoffman*,
  2013 WL 4502097 (D.N.J. Aug. 26, 2013) .........................................6

*Backpage.com, LLC v. Lynch*,
  216 F. Supp. 3d 96 (D.D.C. 2016)...............................................12, 13

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ...............................4, 6, 8, 9

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001)...........................................................................14

*Bridges v. California*,
  314 U.S. 252 (1941)...........................................................................14

*Bridges v. United States*,
237 F.3d 1039 (9th Cir. 2001) ....................................................................27, 28

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981)....................................................................................21, 22

*Cohen v. Beneficial Indus. Loan Corp.*,
337 U.S. 541 (1949)..................................................................................24, 26

*Coyote Publ'g, Inc. v. Miller*,
598 F.3d 592 (9th Cir. 2010) .............................................................................3

*Dart v. Craigslist, Inc.*,
665 F. Supp. 2d 961 (N.D. Ill. 2009)..................................................................7

*Davis v. Walker*,
745 F.3d 1303 (9th Cir. 2014) .....................................................................23, 24

*DiBella v. United States*,
369 U.S. 121 (1962).............................................................................*passim*

*Doe ex rel. Roe v. Backpage.com, LLC*,
104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd sub nom.*
*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir.
2016), *cert. denied*, 137 S. Ct. 622 (2017) .....................................................11

*Elrod v. Burns*,
427 U.S. 347 (1976)...........................................................................................13

*Erotic Serv. Provider Legal Educ. & Res. Project v. Bacerra*,
880 F.3d 450 (9th Cir. 2018) .............................................................................3

*Fort Wayne Books v. Indiana*,
489 U.S. 46 (1989)................................................................................*passim*

*Google, Inc. v. Hood*,
96 F. Supp. 3d 584 (S.D. Miss. 2015), *rev'd for lack of ripeness*,
822 F.3d 212 (5th Cir. 2016) .............................................................................15

*In re Any & All Funds Held in Repub. Bank of Ariz. Accounts*,
774 F. App'x 400 (9th Cir. 2019)....................................................................2, 20

*In re Assets of Martin*,
  1 F.3d 1351 (3d Cir. 1993) .............................................................22

*In re Sealed Case*,
  716 F.3d 603 (D.C. Cir. 2013)........................................................28

*Lacey v. Maricopa Cty.*,
  693 F.3d 896 (9th Cir. 2012) ...........................................................8

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974)........................................................................24

*Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*,
  460 U.S. 575 (1983)........................................................................14

*Mohawk Indus., Inc. v. Carpenter*,
  558 U.S. 100 (2009)........................................................................25

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)............................................................................23

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)........................................................................20

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971)........................................................................14

*NAACP v. Claiborne Hardware*,
  458 U.S. 886 (1982)........................................................................14

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
  432 U.S. 43 (1977) (per curiam)....................................................24

*Near v. Minnesota*,
  283 U.S. 697 (1931)..........................................................................5

*New York v. P.J. Video, Inc.*,
  475 U.S. 868 (1986)......................................................................5, 6

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rights*,
  413 U.S. 376 (1973)..................................................................3, 4, 5

*Simon & Schuster, Inc. v. Fischetti*,
916 F.2d 777 (2d Cir. 1990), *rev'd*, 502 U.S. 105 (1991) ..................................19

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991)........................................................................18, 19, 20

*United States v. Crozier*,
777 F.2d 1376 (9th Cir. 1985) ...............................................................21, 29

*United States v. Ferrantino*,
738 F.2d 109 (6th Cir. 1983) (per curiam) .................................................26, 29

*United States v. Freeman*,
761 F.2d 549 (9th Cir. 1985) ..........................................................................14

*United States v. Jenkins*,
974 F.2d 32 (5th Cir. 1992) ...............................................................17, 18, 22

*United States v. Lacey*,
423 F. Supp. 3d 748 (D. Ariz. 2019) ...............................................................5

*United States v. Lewis*,
759 F.2d 1316 (8th Cir. 1985) ...............................................................26, 29

*United States v. McCray*,
113 F. App'x 770 (9th Cir. 2004) ...................................................................23

*United States v. Michelle's Lounge*,
39 F.3d 684 (7th Cir. 1994) ...........................................................................21

*United States v. Musson*,
802 F.2d 384 (10th Cir. 1986) ...............................................................26, 29

*United States v. P.H.E., Inc.*,
965 F.2d 848 (10th Cir. 1992) .........................................................24, 25, 28

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000)........................................................................................14

*United States v. Premises Known as 608 Taylor Ave., Apartment 302,
Pittsburgh, Pa.*,
584 F.2d 1297 (3d Cir. 1978) .........................................................................27

*United States v. Quintana-Aguayo*,
    235 F.3d 682 (1st Cir. 2000) ..........................................................................21, 25

*United States v. Real Prop. Located at 1407 N. Collins St.,*
    *Arlington, Tex.*,
    901 F.3d 268 (5th Cir. 2018) ........................................................................21, 22

*United States v. Ripinsky*,
    20 F.3d 359 (9th Cir. 1994) ..........................................................................21, 29

*United States v. Roth*,
    912 F.2d 1131 (9th Cir. 1990) ..........................................................2, 21, 22, 29

*United States v. Solomon*,
    795 F.2d 747 (9th Cir. 1986) ................................................................................12

*United States v. Spilotro*,
    680 F.2d 612 (9th Cir. 1982) ..............................................................26, 28, 29

*United States v. Storage Spaces Designated Nos. 8 & 49*,
    777 F.2d 1363 (9th Cir. 1985) ..............................................................................28

*United States v. U.S. Currency $83,310.78*,
    851 F.2d 1231 (9th Cir. 1988) ..............................................................................26

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014) ..................................................................10

*United States v. Ursery*,
    518 U.S. 267 (1996) ..............................................................................................20

*United States v. Vera*,
    893 F.3d 689 (9th Cir. 2018) ................................................................................12

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ..................................................................................4

*Virginia v. Black*,
    538 U.S. 343 (2003) ..............................................................................................14

**State Cases**

*California v. Ferrer I*,
2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016) ............................11

*California v. Ferrer*,
No. 16FE024013, slip op. (Sup. Ct. Sacramento Cty. Aug. 23, 2017) ......................................................................................................11

**Constitutional Provisions**

U.S. Const. amend. I ...........................................................................*passim*

U.S. Const. amend. V ...................................................................................20

**Federal Statutes**

18 U.S.C. § 981 ................................................................................19, 25

18 U.S.C. § 1591 ......................................................................................12

21 U.S.C. § 853(e)(1) .................................................................................29

28 U.S.C. § 1291 .................................................................................23, 24

28 U.S.C. § 1292(a)(1) ..............................................................2, 20, 21, 22

42 U.S.C. § 1983 ......................................................................................20

**Rules**

Fed. R. Civ. P. 54(b)(5) ..............................................................................26

Fed. R. Crim. P. 41(g) .........................................................................23, 25

Fed. R. Crim. P. 12 ......................................................................................5

**Other Authorities**

Caitlan Dewey, *Think twice before answering that ad: 101 murders have been linked to Craigslist*, WASH. POST (Jan. 11, 2016) (https://www.washington_post.com/news/the-intersect/wp/2016/01/11/think-twice-before-answering-that-ad-101-killers-have-found-victims-on-craigslist/) ...................................15

Eric Gershon, *State attorneys general ask Craigslist to drop adult services*, L.A. TIMES (Aug. 24, 2010), http://articles.latimes.com/2010/aug/24/busi_ness/la-fi-craigslist-20100824 ................................................................................................7

*Facebook, Despite Zuckerberg's Reassurances*, BLOOMBERG BUSINESSWEEK (May 10, 2018) (https://www.bloomberg.com/news/articles/2018-05-10/terrorists-creep-onto-facebook-as-fast-as-it-can-shut-them-down) ...................................15

H.R. Res. 649, 112th Cong. (2012) ..........................................................8

http://blog.craigslist.org/2008/11/06/joint-statement-with-attorneys-general-ncmec .................................................................................7

https://web.archive.org/web/20100526124651/www.craigs_list.org/about/help/Adult_Services_Posting_Guidelines .....................................9

https://www.facebook.com/communitystandards/objectionable_content; https://www.gotinder.com/community-guidelines; https://help.twitter.com/en/rules-and-policies#twitter-rules; https://www.craigslist.org/about/prohibited .......................................9

Letter from Sen. Mark Kirk, *et al.* to Scott Tobias, Voice Media Group, Inc. (Oct. 5, 2012), https://www.blumenthal.senate.gov/imo/media/doc/backpagevoicemediagroupletter.pdf ...........................................................................8

# INTRODUCTION

The issue on appeal is straightforward: Can the government seize proceeds from publishing before trial based on unadjudicated allegations that the speech lacks First Amendment protection? The plain answer is "no," and the government has taken great pains to avoid dealing with the merits for the past two years. Now forced to respond, it tries to cloud the issue by addressing arguments never made, mischaracterizing those that were, and in substance conceding the premise that the seizures here are unprecedented and unconstitutional. The government devotes more than a quarter of its brief recapitulating accusations in the warrant affidavits and indictment, but the focus of this appeal is that a probable cause showing is insufficient to support seizure of a publisher's assets.

Separating the wheat from the government's abundant chaff, the only disputed points are narrow. The government devotes much ink (over 20 pages) suggesting it already has proven its case, Gov't Br. 2-3, 9-15, 16-17, 43-46, 47-53, yet repeatedly admits the seizure warrants were supported by nothing more than probable cause. *Id*. at 2, 5, 16-17, 46, 51-53, 67. It *agrees* the First Amendment bars seizures of expressive materials—including materials alleged to lack constitutional protection —based only on probable cause. *Id*. at 55-57. It also *agrees* the First Amendment bars pretrial seizures of non-expressive assets where they would threaten an ongoing speech-related business. *Id*. at 56-57. The only dispute is whether these principles

govern seizure of a publisher's assets where an ongoing business is not threatened, yet the government neither identifies precedent supporting its position, nor explains how it can be harmonized with established constitutional rules. Ultimately, it doesn't even try to reconcile the law, going so far as to admit that, if the seized assets involved speech on a different subject, Appellants would have a First Amendment remedy. *Id*. 66-67. *Compare* Appellants' Opening Br. ("AOB") 29-33 (citing examples).

The rest of the government's brief (19 pages) principally seeks again to dismiss this appeal on jurisdictional grounds. Gov't Br. 21-40. But this Court has already held a pretrial order restraining Appellants' assets is an appealable interlocutory order under 28 U.S.C. § 1292(a)(1). *In re Any & All Funds Held in Repub. Bank of Ariz. Accounts*, 774 F. App'x 400, 401 (9th Cir. 2019) ("*All Funds I*") (citing *United States v. Roth*, 912 F.2d 1131, 1132-33 (9th Cir. 1990)). Rather than devoting the opening of this brief to explaining (once again) how this jurisdictional ploy seeks to avoid the merits, Appellants first clarify the relevant issues and respond substantively. With proper appreciation of the constitutional issues, the government's jurisdictional arguments—based on calculated misunderstandings—collapse of their own weight.

**ARGUMENT**

## I. The Government Cannot Avoid the Issue on Appeal by Misdirection

### A. The Government's First Amendment Arguments Seek to Distract From the Question Presented

The overriding theme of the government's argument is that there is no First Amendment issue here because prostitution ads are unprotected by the Constitution. Gov't Br. 1, 5-6, 41, 61. However, the issue is not whether ads posted by individuals to commit illegal acts are protected—no one has suggested they are. *See* AOB 17-19. The issue is what the government must show to hold the operator of an online forum criminally liable for ads written and posted by third parties, and whether it can seize assets of individuals who owned interests in the operator before that case has been made. *Id*. 20-23.

Liability for aiding and abetting a criminal act requires proof of both knowledge and specific intent to further a particular crime, and the First Amendment bars assuming either knowledge or intent. AOB 20-23. Thus, cases holding prostitutes lack a right to post ads for illegal services are inapposite,[1] as are cases like *Pittsburgh Press Co. v. Pittsburgh Commission on Human Rights*, 413 U.S. 376

---

[1]   *See* Gov't Br. 1, 41, 61 (citing *Erotic Serv. Provider Legal Educ. & Res. Project v. Bacerra*, 880 F.3d 450, 459-60 (9th Cir. 2018), and *Coyote Publ'g, Inc. v. Miller*, 598 F.3d 592, 603-04 (9th Cir. 2010)).

(1973), which held the government can ban ad categories that explicitly promote illegal discrimination. Gov't Br. 5, 41, 61.

*Pittsburgh Press* held the government could prohibit newspaper advertising that *on its face* violated an anti-discrimination ordinance. 413 U.S. at 378. Thus, it does not offend the First Amendment to prohibit classified categories of "Jobs—Male Interest," or (using the Court's hypothetical) to ban "Prostitutes Wanted." *Id.* at 388. But *Pittsburgh Press* would not allow the government to ban a general "Help Wanted" category—or prosecute the paper's publisher—because the government believes many or most ads promote discrimination, just as the First Amendment bars the government from punishing a website for allowing "adult" ads because it contends they are prostitution ads. *E.g.*, *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1281-82 (W.D. Wash. 2012).

The government cannot vanquish First Amendment objections by stating the truism that "discriminatory ads are unprotected speech," and fares no better here by repeatedly proclaiming prostitution ads are unprotected. This Court has cautioned that "[n]othing in *Pittsburgh Press* … suggests that we should expand our inquiry beyond whether the affected speech proposes a lawful transaction to whether [it] is conducted in a lawful manner." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 822 (9th Cir. 2013) (striking down statutory criminal penalties for hiring or soliciting day

laborers via conversations from motor vehicles that impeded traffic).[2] Moreover, whatever else *Pittsburgh Press* may mean, no one would suggest it authorizes the government to seize a newspaper's assets based on probable cause that some of its classified ads promote discrimination.

The government also engages in misdirection when it claims the Arizona district court's denial of a motion to dismiss criminal charges on First Amendment grounds disposes of the issues here. *See* Gov't Br. 19-20, 25, 27, 46, 65. The government mischaracterizes that motion as resting on "the same argument appellants urge here." *Id.* 19-20, 27. Dismissal was sought under Fed. R. Crim. P. 12, and the district court held only that, accepting all the government's allegations, the indictment was sufficiently detailed because "[i]t contains the elements of the offense charged and fairly informs Defendants of the charges[.]" *United States v. Lacey*, 423 F. Supp. 3d 748, 756, 766 (D. Ariz. 2019). Ruling that an indictment is sufficiently detailed has nothing to do with whether assets can be seized before trial. *See Fort Wayne Books v. Indiana*, 489 U.S. 46, 65-66 (1989).[3]

---

[2]   *Compare*, *e.g.*, *Near v. Minnesota*, 283 U.S. 697, 720 (1931) ("Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint [and] it does not matter that the newspaper or periodical is found to be 'largely' or 'chiefly' devoted to the publication of such derelictions.").

[3]   The government's legerdemain also is illustrated by its claim that Appellants advocate "a higher standard than probable cause." Gov't Br. 63-64 (citing, *e.g.*, *New York v. P.J. Video, Inc.*, 475 U.S. 868 (1986)). Nowhere did Appellants suggest the

Another diversion is the claim that Appellants challenged the seizures based on Section 230 of the Communications Decency Act ("CDA"). Gov't Br. 42-43. However, Section 230 *was not even mentioned* in the AOB, and no argument was made based on it. Appellants did cite cases where state laws targeting Backpage.com were invalidated on *both* First Amendment and Section 230 grounds, *e.g.*, *McKenna*, 881 F. Supp. 2d at 1282; *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 at *9-11 (D.N.J. Aug. 26, 2013), AOB 7, 20-21, but only for their relevance to the *constitutional* issues here. Attempts to erect Section 230 as a strawman are disingenuous.[4]

---

Court should adopt a different and "heightened standard" for probable cause. *P.J. Video* and the other cases the government cites address the showing required to permit seizing an item as an exemplar for evidentiary purposes. The issue here is *asset seizures* based on probable cause (as traditionally understood), which the Supreme Court has held impermissible. *Fort Wayne Books*, 489 U.S. at 64-66 (discussing seizure cases, including *P.J. Video*).

[4] Any insinuation that *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), is no longer good law is beyond disingenuous. Gov't Br. 16, 42-45. The underlying case ultimately was mooted by Backpage.com folding (*i.e.*, the plaintiff's business ceased to exist), and the district court granted an unopposed motion for sanctions because representations by Backpage's former CEO in his as-yet-untested criminal plea contradicted his prior sworn statements in that case (and many others). Nothing has altered the holding that official threats directing credit card companies to terminate service to Backpage.com violated the First Amendment. *Dart*, 807 F.3d at 231.

**B.    The Government Treats Accusations as Proof of Guilt**

The government devotes much effort to recapitulating and repeating accusations in the warrant affidavits and indictment that it claims support probable cause. But the focus of this appeal is that probable cause is insufficient to support seizure of a publisher's assets. The government attempts to distract, piling on allegations to paint Backpage.com in the worst light possible—in effect, suggesting it has already proven its case and that it is permissible to pass sentence now. This warped focus makes it necessary to parse the distortions and provide context.

The government's prosecution concerning Backpage.com is the culmination of more than a decade-long effort to coerce online platforms to eliminate adult content. Beginning in 2008, state attorneys general attacked Craigslist's "erotic services" section.[5] Despite key early victories, *e.g.*, *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009), Craigslist capitulated and dropped its adult section. *See Cooper*, 939 F. Supp. 2d at 815-16.

The same tactics were then turned on Backpage.com. Like Craigslist, Backpage.com was a general classified ad website through which users posted in a variety of categories—including buy/sell/trade, automotive, real estate, jobs, dating, adult,

---

[5]    *See*, *e.g.*, http://blog.craigslist.org/2008/11/06/joint-statement-with-attorneys-general-ncmec; Eric Gershon, *State attorneys general ask Craigslist to drop adult services*, L.A. TIMES (Aug. 24, 2010), http://articles.latimes.com/2010/aug/24/business/la-fi-craigslist-20100824.

and services—organized geographically. *See id.* at 813. Users posted some six million ads per month, making it the second-largest classified ad website in the country. *McKenna*, 881 F. Supp. 2d at 1266. State AGs demanded that Backpage.com drop its adult category, and federal officials joined as well.[6]

Unlike Craigslist, however, Backpage.com was owned by newspapermen with a history of resisting abusive tactics. *E.g.*, *Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012). They successfully challenged state legislation targeting adult ads, blocked local law enforcement from issuing unconstitutional threats, and obtained dismissals of state prosecutions and civil suits. AOB 6-8 (collecting cases). The government disparages these cases, asserting Backpage.com misrepresented itself as "a passive host of third-party ads," compared to the government's characterization that "Backpage knowingly facilitated its customers' prostitution." Gov't Br. 5, 42-44, 51. In fact, however, these cases reflected Backpage.com's practices of imposing and enforcing rules to prevent improper content, and actively

---

[6] *See*, *e.g.*, Letter from Sen. Mark Kirk, *et al.* to Scott Tobias, Voice Media Group, Inc. (Oct. 5, 2012) (letter by six senators to company that acquired Village Voice's print operations threatening to hold it "accountable" until "shutting down Backpage's 'adult entertainment' section … has been achieved"), https://www.blumenthal.senate.gov/imo/media/doc/backpagevoicemediagroupletter.pdf; H.R. Res. 649, 112th Cong. (2012) (targeting Backpage and "calling on all Internet media providers to immediately eliminate 'adult entertainment' sections and [similar] classified[s]").

cooperating with law enforcement to investigate and prosecute individuals who misused the website. *See Cooper*, 939 F. Supp. 2d at 813-14.

Backpage.com's users created ads themselves through an automated interface that provided open-text fields to input a title, text, and photos. *See McKenna*, 881 F. Supp. 2d at 1226. Backpage.com imposed rules and terms of use to prohibit (and removed) improper ads and nude photos, as well as advertisement of illegal acts—including offering sex for money—while warning that improper posts would be reported to law enforcement and subject to criminal prosecution. *See id.* Back-page.com's third-party-content rules were similar to those of other websites then,[7] as now.[8]

To enforce its policies, Backpage.com monitored ads through an automated filtering system that (as of 2012) scanned posts for more than 26,000 terms, phrases, and URL or email addresses. For example, in April 2012, Backpage.com blocked or removed over 1,000,000 posts and reported 400 to NCMEC. *Cooper*, 939

---

[7] Craigslist's rules for its adult services category were essentially the same. *See* https://web.archive.org/web/20100526124651/www.craigs-list.org/about/help/Adult_Services_Posting_Guidelines.

[8] Websites impose rules, including prohibiting posts concerning illegal activities and guidelines to prevent nudity or offensive content. *See, e.g.*, https://www.facebook.com/communitystandards/objectionable_content; https://www.gotinder.com/community-guidelines; https://help.twitter.com/en/rules-and-policies#twitter-rules; https://www.craigslist.org/about/prohibited.

F. Supp. 2d at 814.  Moreover, Backpage.com's personnel regularly worked with law enforcement, voluntarily responding to subpoenas (usually within 24 hours), providing testimony, removing posts and blocking users at the request of officials, conducting training seminars, and even doing voluntary research to assist investigators.  *See id*. at 814.

 After Backpage.com (like Craigslist before) won repeated victories against efforts to shutter and censor online classifieds, government officials redoubled efforts to "crush Backpage."  *Dart*, 807 F.3d at 231.  This included the Senate inquiry and criminal proceeding that the government claims caused a "sea-change in the availability of evidence concerning Backpage" to somehow eclipse the prior case law.  Gov't Br. 43-44.  But here's the problem:  Despite intensive investigations and millions of pages produced, officials found zero evidence to support allegations that Backpage.com was responsible for creating or posting ads, or was involved in the business of prostitution.[9]  So the theory shifted to claiming Backpage.com's posting

---

[9]  This distinguishes this case from others the government cites, like *United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) (cited Gov't Br. 51-52), where the creator of Silk Road openly invited ads for unlawful activities (with categories like "Cannabis," "Opioids" and "Ecstasy") and participated in transactions by escrowing payments and collecting commissions.  *Id*. at 549-50; *United States v. Ulbricht*, No. 13-mj-02328 (S.D.N.Y.), Sealed Indictment, Dkt. 1, ¶¶ 8(a), 19(b)-(c), 21(d)-(h).

rules and moderation practices were designed to "sanitize" ads to facilitate prostitution.

But courts rejected this theory too. It was twice rejected in California's attempted prosecution of the website's principals. *California v. Ferrer*, 2016 WL 7237305, at \*7 (Sup. Ct. Sacramento Cty. Dec. 9, 2016) ("*Ferrer I*"); *California v. Ferrer*, No. 16FE024013, slip op. 13-14 (Sup. Ct. Sacramento Cty. Aug. 23, 2017) (dismissing charges of facilitating prostitution based on "moderation system where terms would be deleted or blocked … but the user would still be allowed to post," noting this amounted to "disagreement between public officials and Backpage as to how best to combat sex trafficking"); *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 157 (D. Mass. 2015) (rejecting claims based on alleged violations of 18 U.S.C. § 1595, and holding Backpage.com's practices, including filtering, "amount to neither affirmative participation in an illegal venture nor active web content creation"), *aff'd sub nom. Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017).[10]

---

[10] These cases addressed Section 230, but also held that charges attacking Backpage.com's moderation practices could not establish claims under substantive law for promoting prostitution or participating in an illegal venture. Moreover, these and other cases recognize that Section 230 embodies First Amendment principles for online speech. *See, e.g.*, *Ferrer I*, 2016 WL 7237305, at \*3 (framing issues on demurrer as "whether, and to what extent, Defendants' activities entitle them to protection of their First Amendment rights through [CDA] immunity").

The government also repeatedly cites Carl Ferrer's plea agreement as supposedly decisive evidence unmasking Backpage.com's policies as designed to facilitate prostitution, not combat it. Gov't Br. 2, 3, 9, 14-16, 45, 50-51, 58, 67. However, Ferrer's statement has not been tested in an adversary proceeding, nor has he faced cross-examination. As this Court has warned, a cooperating party's guilty plea "pointing the finger at others" is "inherently unreliable," given how a defendant "signing a plea agreement may adopt facts [] the government wants to hear in exchange for some benefit, usually a lesser sentence." *United States v. Vera*, 893 F.3d 689, 692-93 (9th Cir. 2018). The government says Ferrer's plea "is … itself a conviction," Gov't Br. 58 (citation omitted), but whatever its significance for Ferrer, it cannot bind Appellants. *United States v. Solomon*, 795 F.2d 747, 748-49 (9th Cir. 1986) (co-defendant's guilty plea may not be used as substantive evidence of a defendant's guilt).

The government's mischaracterizations are pervasive. As another example, it quotes *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 108-09 (D.D.C. 2016), but misleadingly adds ellipses to suggest the court held that "if 'Backpage … knowingly host[ed] ad[s] for sex trafficking … it could not argue that such speech is arguably affected with a constitutional interest.'" Gov't Br. 51. In fact, the court wrote that Backpage.com "has not argued that it will knowingly host advertisements for sex trafficking," and concluded it lacked standing to challenge amendments to 18 U.S.C.

§ 1591 targeting the "advertising" of sex trafficking.  Given the website's practices to "prohibit[] illegal content" and "numerous steps to prevent such misuse," including screening, blocking, and removing ads, it had no legitimate fear of prosecution. *Lynch*, 216 F. Supp. 3d at 104, 106.

## II.    The Government Confirms These Seizures Are Unprecedented and Lack Constitutional Support

### A.    The Government Essentially Concedes Pretrial Asset Seizures Are Impermissible Under Basic First Amendment Principles

The government offers no argument for how these seizures can be reconciled with the basic First Amendment requirement to establish speech is unprotected *before* it may impose burdens on the speaker.  AOB 17-23.  Unable to respond to the core principles, the government *admits* a party should be able to obtain relief under the First Amendment if a seizure involved "an Academy-Award winning film … or some of the other hypotheticals appellants propose" if irreparable harm is shown. Gov't Br. 66-67.  This final qualifier is not a limiting factor, as it is black-letter law that loss of First Amendment freedoms, even for minimal periods, unquestionably constitutes irreparable harm.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Otherwise, the government has no response to Appellants' examples describing the logical consequences of its theory, except to dismiss them as "exaggerated rhetoric" and "untethered to reality."  Gov't Br. 64, 66.

The government does not address controlling precedents at all, and merely asserts the cases Appellants cite do not apply because they involved different subject matter. It tries to distinguish cases holding the First Amendment bars financial burdens on publishers by saying nothing more than "[t]hese cases have nothing to do with prostitution advertising," but this does not respond to the controlling principles at all.[11] Categories of unprotected speech, regardless of subject matter, are subject to the same constitutional rules. AOB 17-23. The government offers no rationale for treating "prostitution advertising" differently from other categories that permits it to assume the truth of its allegations.

The government dismisses warnings about its unbridled theory (allegation of unprotected speech + probable cause = ability to seize assets) by saying only that the cases Appellants cite involved speech related to such things as the Vietnam War and civil rights.[12] The government quite literally has no other response.[13] This is

---

[11] Gov't Br. 62 (citing *Bridges v. California*, 314 U.S. 252 (1941); *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983); and *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)).

[12] Gov't Br. 66 (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971); *NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982)).

[13] *See* Gov't Br. 65-66 (describing *Virginia v. Black*, 538 U.S. 343 (2003), as a "threat case" involving "lawful political speech," *Bartnicki v. Vopper*, 532 U.S. 514 (2001), as involving "publication of newsworthy information of acute public concern, not sex-for-hire ads," and *United States v. Freeman*, 761 F.2d 549 (9th Cir. 1985), as advocating "an abstract idea," not prostitution).

simplistic nonsense.  The same constitutional rules apply whenever the government seeks to burden speech it claims is unprotected.

The implications of the government's estimation of its authority is hardly exaggerated.  It would permit the government to seize Mark Zuckerberg's assets based on accusations that Facebook facilitates recruiting by terrorist organizations,[14] or Craig Newmark's assets because of reports about murders connected to Craigslist posts.[15]  Concern about government overreach is not fanciful.  In 2014, Mississippi's Attorney General threatened prosecution and insisted Google "take down entire websites" that "in his opinion, facilitate[d] illegal activity" (including prescription or illicit drug sales, credit card leaks, fraudulent IDs, copyright infringement, and human trafficking).  *Google, Inc. v. Hood*, 96 F. Supp. 3d 584, 593 (S.D. Miss. 2015) (quashing subpoena on First Amendment grounds), *rev'd for lack of ripeness*, 822 F.3d 212, 220, 228 (5th Cir. 2016).  Here, according to the government, there would

---

[14]  Vernon Silver & Sarah Frier, *Terrorists Are Still Recruiting on Facebook, Despite Zuckerberg's Reassurances*, BLOOMBERG BUSINESSWEEK (May 10, 2018) (https://www.bloomberg.com/news/articles/2018-05-10/terrorists-creep-onto-facebook-as-fast-as-it-can-shut-them-down).

[15]  Caitlan Dewey, *Think twice before answering that ad: 101 murders have been linked to Craigslist*, WASH. POST (Jan. 11, 2016) (https://www.washington-post.com/news/the-intersect/wp/2016/01/11/think-twice-before-answering-that-ad-101-killers-have-found-victims-on-craigslist/).

be no constitutional impediment to seizing Google's assets on a mere showing of probable cause, so long as Mississippi did not put the company itself out of business.

## B. The Government Can Identify No Precedent Supporting Seizures of Publishing Assets Based on Probable Cause

The government cites no cases to support its assertion that "courts have rejected extending these limitations to other assets such as proceeds," Gov't Br. 53, and misreads the few cases it cites. *Id*. 53-59. Most of its discussion (five pages) is spent arguing "this is not a prior restraint appeal," *id*. 55-59, without ever directly responding to Appellants' showing that First Amendment harm includes more than just prior restraint. AOB 23-29.

The government cites cases holding the First Amendment *prohibits* seizing expressive materials, then asserts with no support that the principles extend no further. For example, it blatantly mischaracterizes this Court's holding in *Adult Video Ass'n v. Barr*, 960 F.2d 781 (9th Cir. 1992), claiming it "unequivocally 'uph[e]ld section 1963(d)'s provision for the pre-trial preservation of assets.'" Gov't Br. 54 n.9. This is false for two reasons. First, the Court in *Barr* never discussed or ruled on seizures for asset preservation, because defendants "[did] not challenge the other pre-trial procedures authorized by section 1963(d), [so] we need not address their constitutionality." 960 F.2d at 788 n.6. Second, the single sentence on which

the government relies comes from section V(B)(2) of *Barr* that this Court expressly *declined* to re-adopt in *Adult Video Ass'n v. Reno*, 41 F.3d 503, 504 (9th Cir. 1994).[16]

Ultimately, the government's sole support comes from an outdated, out-of-circuit case that does not directly address the issue here. Gov't Br. 55. It cites *United States v. Jenkins*, 974 F.2d 32 (5th Cir. 1992), which upheld a restraining order under Section 1963(d) issued to adult bookstore owners charged with racketeering, prohibiting them from "selling, assigning, transferring, encumbering or removing [assets] from the jurisdiction of the court," but allowing them to continue using assets to pay bills and conduct operations. *Id*. at 33, 35. The court rejected claims that this imposed a prior restraint because it explicitly provided the businesses could continue operating and the government conceded the order could not interfere "with the sale even of obscene materials," as they are presumptively protected. *Id*. at 34-35. Defendants did not raise—nor did the court address—any issue other than prior restraint, so *Jenkins* cannot be construed as holding a restraint on assets necessarily survives First Amendment scrutiny. *See id.* (court indicating it addressed only issues

---

[16] The government similarly misreads *American Library Ass'n v. Thornburgh*, 713 F. Supp. 469, 484 n.19 (D.D.C. 1989), *rev'd on standing grounds sub nom. American Library Ass'n v. Barr*, 956 F.2d 1178, 1194-96 (D.C. Cir. 1992). Gov't Br. 56-57. It suggests *Thornburgh*'s reasoning applies only where seizure of non-expressive assets "may determine whether the business is able to continue," but the actual holding barring seizure of non-expressive assets was not so limited. The government offers no analysis for how such a rule could be workable. *See* AOB 39 (noting government's "Evil Goldilocks" rule).

specifically raised, while cautioning "restraints on the use of funds might under some circumstances improperly impede a defendant's … First Amendment rights").

In any event, *Jenkins* predated *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. 105 (1991), where the Supreme Court held the First Amendment bars encumbering proceeds of publishing even where no prior restraint is involved. *See* AOB 36-37, 41-42. New York's "Son of Sam" law had no effect on works before publication, and invoking its provisions did nothing to impede the flow of expressive materials or threaten any ongoing business. The Court nevertheless held it violated the First Amendment simply because it escrowed publishing proceeds for possible victim compensation.

The government's attempt to distinguish *Simon & Schuster* is more of the same—claiming the New York law applied to inarguably protected speech, while this case "concerns prostitution advertising." Gov't Br. 60-61. This ignores *Simon & Schuster*'s holding and principles and their application to this case: The seizures here are based on *allegations* that Appellants facilitated illegal advertising, while in *Simon & Schuster*, the Supreme Court held encumbering assets was unconstitutional *even when it assumed the income escrowed "represent[ed] the fruits of crime."* 502

U.S. at 119 (emphasis added). In other words, even assuming the underlying activity is *unprotected*, the law escrowing publishing proceeds was unconstitutional.[17]

The government's other attempts to distinguish *Simon & Schuster* are even weaker. It argues the Court invalidated the content-based "Son of Sam" law but left undisturbed generally-applicable provisions for preserving assets to compensate victims. Thus, it reasons, the seizures here cannot be unconstitutional because they were conducted under the generally-applicable provisions of 18 U.S.C. § 981. Gov't Br. 61. This argument confuses facial and as-applied challenges. The distinction is illustrated by the seizures in *Fort Wayne Books*, which were conducted pursuant to Indiana's generally-applicable RICO laws. The Court vacated the seizures because the law was applied in a way that infringed the First Amendment. Same here: Appellants are not challenging a generally-applicable law on its face—they are asking the Court to vacate unconstitutional seizures conducted under that law.

Finally, the government claims *Simon & Schuster* is inapplicable because Appellants have other opportunities to dispute forfeiture of their assets. Gov't Br. 61-62. These "other opportunities" are no answer, *see infra* 22-23, but at best they

---

[17]   The Second Circuit, which had upheld the law, concluded it did not violate the First Amendment because its purpose was "not to suppress speech but to assure that funds are set aside out of profits derived by criminals from the exploitation of their crimes and made available for the payment of judgments later recovered by the victims." *Simon & Schuster, Inc. v. Fischetti*, 916 F.2d 777, 783 (2d Cir. 1990), *rev'd*, 502 U.S. 105. The Supreme Court disagreed.

are worse than what was available under the "Son of Sam" law, where there were no *ex parte* seizures and parties had an opportunity to challenge escrow orders in advance. In that case, no money was paid because the publisher brought a successful First Amendment challenge under 42 U.S.C. § 1983. 502 U.S. at 114-15.[18]

The government cites not a single case supporting its novel theory for seizing a publisher's assets, and cannot distinguish those that uniformly hold pre-trial seizures that threaten First Amendment interests are invalid. The seizures here must be vacated.

## III. The Government's Jurisdictional Arguments Should Again be Rejected.

### A. Challenges to Appellate Jurisdiction Under this Court's Prior Ruling and 28 U.S.C. § 1292(a)(1) Cannot Prevail

This Court previously found interlocutory appellate jurisdiction in this case to review an order that "keeps the seizures in place" because it "amounts to a pre-liminary injunction," *All Funds I*, 774 F. App'x at 401, and is thus "for procedural

---

[18] The government's citation of *United States v. Ursery*, 518 U.S. 267 (1996), and argument that *in rem* civil remedies are not "penalties" is irrelevant to the First Amendment analysis. Gov't Br. 59-60. *Ursery* held only that civil forfeitures are different from criminal penalties in assessing whether the Fifth Amendment's Double Jeopardy Clause has been triggered. Under the First Amendment, however, civil damages "may be markedly more inhibiting than the fear of prosecution under a criminal statute." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).

purposes … appealable … under [§] 1292(a)(1)." *Roth*, 912 F.2d at 1133.[19]  So too now, as Section 1292(a)(1) allows appeals of orders "granting [or] continuing … injunctions," 28 U.S.C. § 1292(a)(1), which is the "practical effect" of the instant order continuing to restrain Appellants' assets.[20]  Any claim the prior ruling is not dispositive here because it involved a stay, Gov't Br. 29, is wrong.[21]

That holding extends further than the government credits, as *Roth* equated pretrial asset restraints with preliminary injunctions that are appealable interlocutory rulings.  *See* 912 F.2d at 1132-33.  It also defeats claims that cases involving criminal restraining orders are "inapposite," Gov't Br. 30, given the reliance on *Roth*.  The government cites cases discussing rules applicable "generally" to interlocutory appeals of civil seizure warrants,[22] but none from this Court, and thus none undercutting reliance on *Roth*.

---

[19]  *Accord United States v. Crozier*, 777 F.2d 1376 (9th Cir. 1985); *United States v. Ripinsky*, 20 F.3d 359, 361 (9th Cir. 1994); *United States v. Real Prop. Located at 1407 N. Collins St., Arlington, Tex.*, 901 F.3d 268, 271-72 (5th Cir. 2018).

[20]  *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83-84 (1981) (deciding if order is appealable injunction under § 1292(a)(1) requires examining its "practical effect") (cited Gov't Br. 31).

[21]  The government observes that "[w]hile a stay order grinds proceedings to a halt, the civil forfeiture proceeding is … ongoing," Gov't Br. 30, but the same problem remains:  the order appealed continues restraint of Appellants' assets from publishing.

[22]  *See* Gov't Br. 31-32 (citing, *inter alia*, *United States v. Quintana-Aguayo*, 235 F.3d 682 (1st Cir. 2000); *United States v. Michelle's Lounge*, 39 F.3d 684 (7th Cir. 1994)).  Professed concerns, based on these cases, that accepting jurisdiction here

As to other circuits that also found jurisdiction in civil forfeiture cases, the government merely labels one such case "unpersuasive," *id*. 32 n.5 (citing *1407 N. Collins*, 901 F.3d 268, *supra* note 19), but offers no reasoning and says nothing of other cases to the same effect. *See*, *e.g.*, *In re Assets of Martin*, 1 F.3d 1351, 1355 (3d Cir. 1993) (citing *Roth* and Fifth Circuit cases). Tellingly, *Jenkins*, the Fifth Circuit case cited as the government's sole supporting merits case, Gov't Br. 55, accepted jurisdiction under § 1292(a)(1) for an interlocutory appeal in similar circumstances. 974 F.2d at 34. And the government notably admits "an interlocutory order [is] immediately appealable under § 1292(a)(1)" for "irreparable harm that can be effectively challenged only by immediate appeal." Gov't Br. 30-31 (citing *Carson*, 450 U.S. at 84).

The First Amendment violation here, which the order on appeal (and prior stay order) erroneously failed to curtail, began two years ago upon seizure of Appellants' assets and remains ongoing.[23] That harm cannot be remedied by continued seizure proceedings below or the Arizona criminal case. *E.g.*, Gov't Br. 34-35, 37, 40. Once those cases conclude, claims involving *pre-adjudication* seizure of assets

---

would mean "all civil seizures would be reviewable in the first instance," Gov't Br. 31, takes too broad a view, and is easily debunked. *See infra* 25.

[23] That Appellants "are not claiming the seizure[s] … effectuated a shutdown of any business," Gov't Br. 32, is thus irrelevant. *See supra* 16-18.

will be moot—*postjudgment* review cannot remedy unconstitutional *pretrial* seizures.[24]  Such denials of First Amendment rights necessarily impose irreparable injury and can only be remedied in the present appeal.

## B. Denial of the Motion to Vacate the Seizures is an Immediately Appealable Collateral Order

Appellate jurisdiction also lies because denying review of Appellants' constitutional harm leaves them "effectively out of court," *Davis v. Walker*, 745 F.3d 1303, 1308-10 (9th Cir. 2014), under *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 9 (1983) (construing 28 U.S.C. § 1291).  Here, denial of review puts Appellants "out of court" because neither forfeiture proceedings nor the federal criminal case (or any other means the government offers) can remedy Appellants' constitutional injury.  *See supra* 22-23 & note 24.  When the First Amendment is implicated, immediate appeal of orders that irreparably deprive parties of constitutional rights is critical.  *See Fort Wayne Books*, 489 U.S. at 56.

---

[24]  Nor can they be remedied by other means the government suggests.  Gov't Br. 34-36, 37-40.  By its own account, a motion under Criminal Rule 41(g) is no option.  *Id.* 38-39.  It also amounts to no more than further civil proceedings that, as shown, are no solution.  Nor are "ancillary proceedings connected to Backpage and Ferrer's guilty pleas," as they would relate to third-party assets, not Appellants' own.  *See id.* 4, 37.  A *Monsanto* hearing, *see id*. 32-33, 35-36, would likewise be irrelevant as focusing on ability to pay counsel with untainted assets, *see*, *e.g.*, *United States v. McCray*, 113 F. App'x 770, 772 (9th Cir. 2004), not the constitutionality of asset-restraints.

*Accord Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 246-47 & n.6 (1974);

*United States v. P.H.E., Inc.*, 965 F.2d 848, 857 (10th Cir. 1992).

There is also appellate jurisdiction pursuant to the collateral order doctrine under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), which held "§ 1291's reference to 'final decisions' includes … interlocutory orders that 'finally determine claims … separable from, and collateral to, [those] asserted in the action." *Davis*, 745 F.3d at 1308 (citing *Cohen*, 337 U.S. at 546). The doctrine plainly applies in First Amendment cases like this.[25] First, allowing continuation of seizures of publishing assets based on mere allegations of illegal speech conclusively determines the constitutional issue by rendering the violations a *fait accompli*. Second, the seizures' unconstitutionality is separate from whether, in fact, the speech is unprotected and can constitutionally be punished. Third, that issue is unreviewable if not appealed immediately. *See Davis*, 745 F.3d at 1309 (listing collateral order doctrine criteria).

The government claims Appellants do not raise "'questions completely separate from the merits'" of "forfeitability of the seized property (or guilt in the

---

[25] *See*, *e.g.*, *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 44 (1977) (per curiam) (collateral order doctrine applies where failure to take jurisdiction would ignore "strict procedural safeguards" for free speech cases, "including immediate appellate review"); *P.H.E.*, 965 F.2d at 855, 856.

criminal case)," Gov't Br. 28-29, but as shown, that misstates the issue (*i.e.*, constitutionality of seizing assets from publishing based on mere allegations speech was unlawful). *Supra*, § I.A. The "ultimate issues" of forfeitability or guilt will remain after this appeal, as the government can still obtain post-trial forfeitures if it proves in the criminal proceeding Appellants knowingly and with specific intent published illegal ads. The issues are not "inextricably intertwined." Gov't Br. 29, 31 (citing *Quintana-Aguayo*, 235 F.3d at 685).

The government incorrectly claims allowing this appeal would mean the "entire category" of "motions to return the property seized pursuant to a civil seizure warrant [become] immediately appealable." Gov't Br. 28 (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009)). Here, the "entire category" is not all civil seizures, but those that punish speech based on mere allegations, where First Amendment rights will be lost, "probably irreparably," if no appeal lies. *P.H.E.*, 965 F.2d at 855, 856.

## C. *DiBella v. United States* **Does Not Apply to This Case**

The government's primary attack on jurisdiction, based on *DiBella v. United States*, 369 U.S. 121 (1962), Gov't Br. 21-27, cannot prevail because it requires "treating" the challenge to the seizures' constitutionality as a motion under Criminal Rule 41(g). *See id.* 20 (citing ER5-15). Forfeitures under 18 U.S.C. § 981 are *civil* cases. The government never explains how Appellants' motion in a civil forfeiture

case can fall under a rule of criminal procedure. As this Court made clear, "Rule 54(b)(5) [now 1(a)(5)(b)] expressly provides that the Federal Rules of Criminal Procedure 'are not applicable to … civil forfeiture.'" *United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1233 (9th Cir. 1988). This Circuit and others have held orders restraining assets proper for appellate review.[26]

The claim that, under *DiBella*, "[t]he substance of the motion, not its form, controls," Gov't Br. 22-23 (quoting *Andersen v. United States*, 298 F.3d 804, 807 (9th Cir. 2002)), ignores how *DiBella*'s "substance" was quite different. There, the Supreme Court held orders on pre-indictment motions to suppress evidence are not independently appealable during *criminal* proceedings. Such rulings, the Court explained, "necessarily determine the conduct of the [forthcoming] trial and may vitally affect the result." *DiBella*, 369 U.S. at 127. It also noted, however, that, for property restraints (seizures), "immediate appeal has been allowed … as collateral," because it "will not 'affect or be affected by … the merits of the case,' when the practical effect … will be irreparable by any subsequent appeal." *Id.* at 126 (quoting *Cohen*, 337 U.S. at 546).

---

[26] *See United States v. Spilotro*, 680 F.2d 612, 615 (9th Cir. 1982); *accord United States v. Ferrantino*, 738 F.2d 109, 110-11 (6th Cir. 1983) (per curiam); *United States v. Lewis*, 759 F.2d 1316, 1327 n.4 (8th Cir. 1985); *United States v. Musson*, 802 F.2d 384, 385 (10th Cir. 1986).

It was in *that* context that the Court stated the rule the government invokes here: "Only if the motion is solely for return of property and is in no way tied to a criminal prosecution *in esse* … can the proceedings be regarded as independent." *Id*. at 131-32. *See* Gov't Br. 20-21. Courts have recognized that *DiBella* bars immediate appeal if a motion's essential character is to suppress evidence, but not if it seeks return of property. *E.g.*, *United States v. Premises Known as 608 Taylor Ave., Apartment 302, Pittsburgh, Pa.*, 584 F.2d 1297, 1300-01 (3d Cir. 1978).

The government's *DiBella* cases involve criminal suppression motions, not civil forfeitures. *See* Gov't Br. 22-25. *Andersen* involved return of business records seized via search warrant during a grand jury investigation, and enjoining their use and further seizures. 298 F.3d at 806, 808. This Court held *DiBella* precluded appeal as that relief would interfere with the criminal investigation, and did not merely involve returning property. *Id.* at 808.[27] In *Bridges v. United States*, 237 F.3d 1039 (9th Cir. 2001), where the investigation's target moved for return of records seized

---

[27] The government emphasizes that the *Anderson* plaintiffs invoked the First Amendment, *see* Gov't Br. 22-24, but *Andersen* still involved suppressing evidence and further seizures, where the court could address such constitutional concerns at trial. *See* 298 F.3d at 808-09. Here, Appellants' assets are not evidence in a criminal proceeding, *see* Gov't Br. 2, and delaying a ruling denies them a constitutional remedy. *See supra* 22-23.

before the target was indicted, the Court applied *DiBella* because the motion affected the admissibility of evidence that "will be part of a … prosecution." *Id.* at 1041.[28]

It is simply wrong to claim *this* appeal will affect Appellants' prosecution because it raises "First Amendment grounds similar" to those in "the Arizona criminal proceeding," or that they seek to "disrupt" it, Gov't Br. 27-28—this appeal poses no such threat, factually or legally. Unlike *DiBella*, *Andersen*, *et al.*, the (purely legal) issue here is whether the government may assume guilt and seize assets from publishing based on probable cause. This is central to the constitutional issue presented, where delay deprives Appellants any meaningful protection of their rights. *See Spilotro*, 680 F.2d at 615; *P.H.E.*, 965 F.2d at 857. Reaffirming the rule from *Fort Wayne Books* and *Adult Video Association* that probable cause cannot justify pre-trial asset seizures will not impede the Arizona prosecution. Both this Court and the Supreme Court have held different constitutional rules govern pre-conviction seizures and post-conviction forfeitures. *Id.* *See also Alexander v. United States*, 509 U.S. 544, 552 (1993).

---

[28] *United States v. Storage Spaces Designated Nos. 8 & 49*, 777 F.2d 1363 (9th Cir. 1985) (cited Gov't Br. 24), like *DiBella*, involved only suppression and return of property that was evidence of crime. *In re Sealed Case*, 716 F.3d 603 (D.C. Cir. 2013) (cited Gov't Br. 26-27), is to like effect, even if the movant sought only return of property and not suppression, as that distinction did not affect the analysis. *See id*. at 607.

Arguments based on *DiBella* are further belied by precedents of this Court and other Circuits. In *Spilotro*, this Court exercised jurisdiction over a due process challenge to an order restraining assets based on allegations of forfeitability under RICO, because it was distinct from the prosecution, even if "not entirely separable." 680 F.2d at 615. It held that "whether the statute and the Constitution permit such an order … at this [pretrial] stage" or "what kind of evidentiary burden the Government must meet" would "not be answered by … the pending criminal trial." *Id.* at 615. *See also id.* (permitting pretrial asset restraints could "cause … rights to be irreparably lost" if review had to await criminal proceedings) (citing and discussing *Crozier*, 674 F.2d at 1297).[29] The government never addresses *Spilotro*, and its only response to *Roth* and *Ripinsky* is that the decision here was not expressly styled as "a 'restraining order or injunction,'" Gov't Br. 30 (quoting 21 U.S.C. § 853(e)(1)), which, as the Court's precedents cited here reflect, is of no moment where important rights are irremediably at stake. *See Ripinsky*, 20 F.3d 359 (rejecting government challenge to *Spilotro*); *Roth*, 912 F.2d 1131. *See also* cases cited note 19, *supra*.

---

[29] Other circuits have similarly held constitutional challenges are immediately appealable, notwithstanding *DiBella*. *See, e.g., Lewis*, 759 F.2d at 1327 n.4 (citing Sixth and Ninth Circuit precedent); *Ferrantino*, 738 F.2d at 110; *Musson*, 802 F.2d at 385.

## CONCLUSION

Appellants respectfully urge this Court to reverse the District Court's order denying Appellants' Motion to Vacate, and order the seizures vacated to prevent further deprivation of their constitutional rights.

RESPECTFULLY SUBMITTED this 19th day of May, 2020.

James C. Grant
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 622-3150
Facsimile: (206) 757-7700
Email: jamesgrant@dwt.com

Robert Corn-Revere
Ronald G. London
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800
Washington, DC 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
        ronaldlondon@dwt.com

Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN PC
903 Calle Amanecer
Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
Email: tbienert@bienertkatzman.com
        wbernstein@bienertkatzman.com

Paul John Cambria, Jr.
Erin McCampbell Paris
LIPSITZ GREEN SCIME
    CAMBRIA LLP
42 Delaware Avenue
Suite 300
Buffalo, NY 14202-3857
Telephone: (716) 849-1333
Email: pcambria@lglaw.com
        eparis@lglaw.com

Bruce Feder
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road
Suite 160
Phoenix, AZ 85016
Direct: (602) 257-0135
Email: bf@federlawpa.com

Gary S. Lincenberg
Ariel A. Neuman
BIRD, MARELLA, BOXER,
    WOLPERT, NESSIM, DROOKS,
    LINCENBERG & RHOW P.C.
Suite 2300
1875 Century Park East
Los Angeles, CA 90067-2561
Telephone: (310) 201-2100
Email: glincenberg@birdmarella.com
        aneuman@birdmarella.com

## STATEMENT OF COMPLIANCE

The foregoing brief complies with the requirements of Cir. Rule 32, because it is proportionately spaced in Times New Roman 14-point type, and according to the word processing system used to prepare it, and in accordance with Circuit Rule 32(a)(7)(B), the word count of the brief is 6,989.

DATED this 19th day of May, 2020.

DAVIS WRIGHT TREMAINE LLP

By s/*Robert Corn-Revere*
      Robert Corn-Revere
      1919 Pennsylvania Avenue, N.W.
      Suite 800
      Washington, DC  20006
      Tel:  (202) 973-4200
      Fax:  (202) 973-4499
      Email:  bobcornrevere@dwt.com

      Attorneys for Appellants